GEORGE E. INGRAHAM vs. WARREN S. TAYLOR AND
ANOTHER.

Hartford Dist., May T., 1889. PARDEE, LOOMIS, BEARDSLEY and F. B.
HALL, Js.

The defendants, stockbrokers, agreed with the plaintiff to buy certain stocks
for him on a margin and hold them subject to his demand, he to advance, as required, sufficient money to protect them from loss. Held
that the defendants were not bound to make an actual purchase of the
stocks, but that it was enough if they were ready and able at any time
to procure them in the market and deliver them on demand at the price
of the day of the contract.

And the stocks having declined in the market, it was held that no damage
could have resulted to the plaintiff by the neglect of the defendants to
make an actual purchase of them.

[Argued May 8th—decided June 3d, 1889.]

ACTION to recover for money advanced to the defendants
as stockbrokers for the purchase of certain stocks; brought
to the Superior Court in Hartford County. The following
facts were found by the court.

In the year 1887 the plaintiff resided in Enfield and the
defendants were engaged in business as brokers in Hartford.
On the 27th of April of that year the plaintiff requested
the defendants to purchase for him one hundred shares of
the capital stock of the Kansas & Texas Railroad Company,
at 32¼, to be held by them on a margin, and the defendants on the same day replied to him as follows:—" We have
this day bought for your account and risk 100 K. T. at
32¼." It was then agreed between the parties that they
should hold these stocks for the plaintiff, and that he should
from time to time pay to them sufficient sums to save
them from loss if they should fall in price. And the plaintiff on that day paid $100 to the defendants, and from time
to time thereafter paid such sums as were required by them,
until he had paid the sum of $900.

From time to time thereafter the defendants made similar
contracts with the plaintiff upon the same terms and conditions, and he paid them the sums stated in his bill of partic-

ulars for the stocks therein named, and they signed similar agreements therefor.

On the 11th day of August, 1887, the plaintiff gave the defendants a note and mortgage for $3,000, and received from them $1,500 thereof, and the remainder was applied as margins on the agreements, and is a portion of the payments thereon set out in the bill of particulars.

On the 5th of August, 1887, the plaintiff gave the defendants at their request a " stop-loss " order, to sell the several stocks whenever they should depreciate to the prices therein named, being the limit to which the margin advanced protected them.

The defendants had in their office in Hartford a private wire connected with the Public Grain & Stock Exchange, a corporation in New York dealing in grain, provisions, stock, and bonds, and through which they were accustomed to make purchases or sales as ordered by customers. The New York house had no knowledge of the plaintiff, but dealt entirely with the defendants,—they being bound to protect the New York house, and protecting themselves with the plaintiff. These transactions were in the usual course of business followed by the defendants in dealing with their customers and with their New York correspondents.

The defendants had had upwards of fifty similar transactions with the plaintiff prior to the ones in suit. In none of them did the plaintiff receive any certificate of stock, and did not of his own knowledge know whether they were bought or sold, except as he was informed by the defendants.

The plaintiff was well acquainted with the general course of business pursued by the defendants in purchasing and selling stocks for their customers, and the orders which he gave April 27th, 1882, and subsequently, were made with such knowledge.

After the 5th of August the stocks steadily declined in value. Thereupon the defendants, on the 24th of August, went to New York and requested their correspondent to forward the stocks to them at Hartford, but the correspondent declined to do so unless the defendants would first pay them

in cash the amount necessary, with the margins already paid, to amount to the purchase price. This the defendants did not do, but made an arrangement with Jones, McCormick & Kennett, brokers, of New York, by which the defendants deposited with them $4,500 and drew a draft on them for $10,978.75, payable at the Connecticut Trust & Safe Deposit Company, Hartford, and sent the same through the Manhattan Bank of New York to the Farmers & Mechanics' Bank, Hartford, with shares of stock similar in number and kind with those named in the bill of particulars; the stocks to be delivered when the draft was paid. The latter bank received the draft and stocks August 26th, and sent them to the Connecticut Trust & Safe Deposit Company, which paid the draft and received the stocks under an agreement with the defendants that it should pay the draft and receive a note of the defendants dated August 26th, for $13,968.75. The consideration of the note was to be the amount of the draft, $10,978.75, and $2,990 cash then advanced to the defendants. The Deposit Company was to hold the stocks as collateral.

On said 26th day of August the Deposit Company, by an arrangement with the defendants, sold through a broker in Hartford a part of the stocks, for which it received $8,406.25, which it then indorsed as part payment on the note of the defendants; and on the first day of September it sold the remainder of the stocks to Mrs. Ingraham, the mother of the plaintiff, for $5,410, with the assent of the plaintiff, leaving then due on the note $152.50, which was paid by the defendants. The stocks sold August 26th reached the limit specified, and were sold at that price. The stocks subsequently sold to Mrs. Ingraham had not reached the limit.

On said 26th day of August the defendants about eleven o'clock A. M. gave to the plaintiff the following notice:—

"HARTFORD, August 26, 1887.

"MR. GEORGE INGRAHAM: *Dear Sir*,—We have on deposit in this city certificates of stock purchased for your account some time since on margin. We hereby offer to deliver the certificates to you immediately upon the payment of the

balance due, which amounts to $13,978.25. The certificates which we hold for you are the following :—[naming them.] The condition of the market is such that we must refuse to carry these stocks for you on margin account, and we hereby notify you that we shall sell them promptly when the present margin is exhausted unless you take them off our hands immediately. W. S. TAYLOR & CO."

Later on the same day the defendants telegraphed the plaintiff that they had sold the stocks, with the prices for which they were sold.

With the exception of the foregoing transaction with Jones, McCormick & Kennett, the defendants did not personally purchase any of the stocks which by the contracts they agreed they had purchased ; but they claimed that they purchased them from time to time, as ordered, through their agent, the Public Grain and Stock Exchange, and that the Stock Exchange held them for the defendants until August 24th, 1887, to be delivered to the plaintiff when paid for and demanded. This the plaintiff denied. The court ruled that the burden of proof upon this question was on the defendants, and found upon the evidence that the Stock Exchange did not buy and hold the stocks as claimed.

On the respective days when the agreements mentioned were made between the parties, the defendants in each case telegraphed to the Stock Exchange to buy for the account of the defendants the stocks mentioned in the agreements, and paid to its account in the Connecticut Trust & Safe Deposit Company, or sent to New York, the amounts paid to the defendants by the plaintiff as margins. And on each transac-. tion the defendants received from the Stock Exchange a telegram that they had bought the stocks at the prices named before the defendants gave the plaintiff the memorandum above stated, and on the next day received from the Stock Exchange a memorandum stating that they had so purchased the same for the defendants, and crediting the amount of margin then received by the defendants and paid to the Stock Exchange.

The nature of the arrangement between the defendants

and the Stock Exchange was not fully disclosed by the evidence, and was unknown to the plaintiff; but whatever it was, it was closed out on the 24th of August, 1887, and in settlement thereof the Stock Exchange paid the defendants $1,510, being the unexhausted portion of the margins, or some of them, on the stocks.  And the defendants purchased the several stocks of Jones, McCormick & Kennett at the same price at which they were closed out with the Stock Exchange.

The transaction between the defendants and the Stock Exchange of August 24th, 1887, and the transactions of the same date between the defendants and Jones, McCormick & Kennett, and also those in Hartford relating to the receipt and sale of the stocks by the Deposit Company, and the transactions connected therewith, were unknown to the plaintiff at the time except so far as the letter and the telegram of August 26th gave him notice; and they have not since been ratified by him unless the sale of stocks to his mother by his assent and approval constitutes a ratification in whole or in part.

The stocks transferred to Mrs. Ingraham were worth, at the time, about $500 more than the price paid by her.  The margins paid on the stocks by the plaintiff amount to $1,930.

Upon these facts the case was reserved for the advice of this court.

*C. E. Perkins* and *S. E. Clarke*, for the plaintiff.

The defendants, in consideration of commissions paid them, agreed to purchase for the plaintiff sundry shares of stock, which they agreed to carry on a margin, and relying on their agreement he paid to them for such margins and commissions $5,525.  The object of this margin was, assuming that the defendants had actually purchased and were holding these stocks for the plaintiff, to secure them against any loss that they might sustain by their fall in price.  It was only upon the supposition that stocks were to be actually purchased that any margin needed to be advanced, for if no stocks were in fact bought no actual loss could be sustained.  During

these transactions the plaintiff borrowed of the defendants $3,000, and secured the same by a mortgage, half of which sum he paid to the defendants as margin, being a portion of the total sum advanced, and the remainder he used for other purposes. On the 5th of August, 1887, all these stocks had materially declined in the market, and the defendants obtained from the plaintiff a "stop-loss" order, as it is called, by which he authorized them to sell any of the stocks so held by them if the price fell to certain figures given, if he did not furnish additional margin when necessary. On the 24th day of August they gave him a notice at eleven o'clock in the morning, that they should sell certain of the stocks, and would not receive any further margins or carry them for him any longer, and the same afternoon telegraphed him that they had so sold some of them. The remaining stocks, which had not fallen below the margin, were a few days afterwards purchased by his mother, with his consent, he supposing that the whole proceeding was in good faith, that these stocks had been actually purchased by the defendants at the time they made the contracts with him and had been held by them all the time, and that the moneys he had advanced as margins had been applied by them to make up losses they had actually sustained by buying the stocks at the times and prices agreed and selling them at lower prices. It appeared, however, upon the trial, and is found by the court, that in fact the defendants did not buy any of these stocks at the times they pretended they had. They received the money and paid more or less of it over to a corporation in New York for some purpose which they refuse to disclose, but they pretended to the plaintiff that they had so bought them and were holding them, and during the whole time from April 27th to August 11th continued calling upon him for additional margins, which he paid to them. On the 24th, 25th, and 26th of August they pretended to make purchases and sales, to make him think that they had held the stocks all the time and were then selling them. On the 11th of August, therefore, the defendants, by these false representations and statements, had succeeded in obtaining $5,525

from the plaintiff on the pretense that they had bought certain stocks for him, when in fact they had not bought any, and had made him believe that this money had been lost by the depreciation of these stocks; all which was false. The plaintiff then clearly, on this state of facts, was entitled to recover all this money back from the defendants as moneys held for his use, and they had no right to any of it, either as margins, for none had been needed, or as commissions, for they had purchased no stocks for him.

*A. P. Hyde* and *L. Sperry*, for the defendants.

PARDEE, J. In effect the claim of the plaintiff is that, between the 27th day of April and the 30th day of August, 1887, the defendants, stock brokers, made several contracts to purchase and carry for him on a margin account certain stocks; that he paid to them on that account more than five thousand dollars; and that they did not purchase any stocks but converted the money to their own use. His suit is for the recovery of the money so paid.

The defendants reply in effect that they purchased, between the days mentioned, sundry stocks for and at the request of the plaintiff on margin, and that the stocks depreciated to the extent of his account, and that the plaintiff paid the money on that account.

Upon the finding, on April 27th, 1887, and on divers days between that day and the 26th day of August following, the defendants, at Hartford, where they carried on their business, made several agreements with the plaintiff to buy and hold specified stocks for him on a margin account; he to pay, as required, sufficient money to protect them from loss.

By such contracts the plaintiff bought the right to demand at his option as to time the delivery of shares at the price of the day of the agreement; the defendants, in consideration of his payments upon margins, assumed the risk of an undertaking to deliver shares upon demand at that price.

He secured the possibility of profit if within an indefinite time the selected stock should rise in price, without being

compelled to furnish the capital necessary for the purchase of it. Such contract does not import that the defendants obligated themselves to furnish the capital necessary for the payment of the full price of the shares upon the day of the contract as upon the taking of a certificate thereof, and allow the plaintiff to lock up that capital, indefinitely as to time, at his option, without interest, when the profits of the transactions were all to him and the losses in part possibly to them. Nor is it of the essence of the contract that they should acquire possession of a certificate of the shares on the day of its date.

He designedly made the day of demand uncertain ; and inasmuch as each share is the equal of any other in the same corporation, and the shares of the corporation specified were in the market on every day, the possession of a certificate bearing a particular date is not required; only that they should be able to deliver it upon demand, at the price of the day of the contract. The contract required the plaintiff to put his margin money at the hazard of their ability to respond in the event of a rise in the price of shares; required him to furnish all capital necessary for the speculation ; secured to him all profits; and denied to them any advantage other than the customary commission.

As has been said, the money paid by him to them was the consideration for their risk in agreeing to become responsible for specified shares during an indefinite period at the price of the day of contract, and as they did assume such risk, and the shares did depreciate to the full extent of the margins paid to them, they performed their contract and earned and exhausted the margins. For, while the plaintiff continued in the exercise of his right to rest upon margins, before he had put an end to his period of uncertainty, and before he had asked for or was willing to receive any certificate, he ordered the sale of specified shares if they should reach a fixed point in depreciation.

These were sold upon such order ; and such sale is legally equivalent to a delivery of a certificate therefor to him. And certificates for the remaining shares were delivered

upon his order. He has thus had everything which his contract secured to him—unlimited opportunity for speculation, and certificates upon demand at the price of the day of his contract.

And as the shares depreciated the contract has never been anything but a burden to him. He has failed to prove that any act or omission to act upon the part of the defendants has worked any injury to him.

The Superior Court is advised to render judgment for the defendants.

In this opinion the other judges concurred.