PAUL C. SKIFF AND OTHERS *vs.* EZEKIEL G. STODDARD,
TRUSTEE.

New Haven & Fairfield Cos., Jan. T., 1893. ANDREWS, C. J., CARPENTER, TORRANCE, FENN and PRENTICE, JS.

*B & S* as partners were private bankers and brokers. As brokers they bought and sold, through the New York Stock Exchange, stocks and securities upon a margin. *B* died, and *S* as surviving partner thereupon made an assignment in insolvency. The plaintiffs were their customers, acquainted with the general manner in which their business was conducted. At the time of the assignment the firm was carrying stocks and securities purchased and held by reason of the orders of the plaintiffs and other customers dealing through them upon margins. The course of dealing, which was in conformity with the custom of brokers in New York and Connecticut and in the New York Stock Exchange, was as follows: The customer filed with *B & S* a written order to buy for his account and risk the stocks and securities specified. The order was at once telegraphed by *B & S* to their New York correspondents, who forthwith upon the exchange purchased what was ordered, received the certificates or proper evidence of title, and paid the purchase price. *B & S* were at once notified of the purchase, and they in turn

Skiff *v.* Stoddard.

notified the customer and charged the cost to him. The customer was required to pay *B & S* and maintain a stipulated margin. These margin payments were credited to the customer's account. Stocks bought were not ordinarily delivered to the customer. It was not understood that they should be until the price thereof, with interest and commissions, was paid. Dividends were credited to the customer. He paid interest upon all advances. He had the right to command a sale at any time and an accounting of the proceeds. It was agreed that if the margin became reduced to two per cent *B & S* might sell without notice. *B & S* had a commission upon all transactions, and had no further benefit or profit from them. The risk was the customer's. *B & S* in their dealings through their New York correspondents were required to keep an agreed margin with them. The latter advanced the money required to execute orders, and held the purchased property as security for such advances. As it was desired the property was forwarded to *B & S.* *B & S,* as a firm and individually, dealt in the market in the same manner as their customers. At the time of the assignment the stocks and securities carried by *B & S* upon their customers' orders were in part in the hands of the firm, in part in the hands of the New York correspondents as security for *B & S's* indebtedness to them, and in part in the hands of other parties with whom they had been hypothecated by *B & S.* The plaintiffs were variously indebted to *B & S.* Held—

1. That *B & S,* in executing a customer's order to buy, were acting as his agents.
2. That the title to the purchased property vested at once in the customer.
3. That *B & S* thereafter carried the property as pledgees of the customer.
4. That absence of delivery to him as buyer and re-delivery to *B & S* as pledgees, did not affect the relation, these formalities being regarded as waived.
5. That the fact that the identical shares originally bought for each customer were not kept separate and apart from other like shares did not destroy the pledge.
6. That the exercise of the right to sub-pledge was not inconsistent with the pledge relation, since the power to sub-pledge was impliedly given.

A pledgee of stocks may cause them to be transferred into his own name upon the books of the corporation. He fully preserves the rights of the pledgeor if he at all times has on hand similar stock equal in amount to that pledged.

One who employs another to deal in a particular market will be held as intending that the mode of performance shall be in accordance with the established customs and usages of that market unless the custom or usage is either immoral, unlawful, unreasonable, contrary to the express agreement of the parties, or such as to change the intrinsic character of the undertaking. A custom of the stock market that a broker buying stocks on margin may re-hypothecate to enable him to obtain money to carry his transactions, is not one which the courts will disregard.

Whether a custom of the market which authorizes a pledgee in a margin-buying transaction, temporarily, and to effect short sales, to reduce his carrying of any stock below the amount required to meet the demands of all his customers will be sanctioned: *Quære.*

The plaintiffs as pledgeors were entitled to redeem the stocks and securities purchased by them.

The assignment did not interfere with the exercise of this right.

In order to enable the plaintiffs to redeem they must be able to reasonably identify their stocks or securities.

Where any plaintiff or other customer was able to identify any certificate or evidence of title as the precise one bought upon his order, or as actually carried in the fulfillment of such order as a substitute for the original one, the identification would be sufficient.

Where it appears that a block of any kind of stock sufficient to meet the demands of all customers of that stock was being carried, each customer would be entitled to redeem shares in amount equal to his carrying.

Where, after all efforts at precise identification have been exhausted, it appears that there is a shortage of any kind of stock, it will be presumed, in the absence of proof to the contrary, that such shortage arose by reason of sales of stock of the firm or its members, and that the stocks on hand were being carried for the outside customers. In such cases, if there remained stocks sufficient to satisfy the demands of all such customers, each might redeem his full amount; otherwise, each would take his ratable proportion.

Any burden incident to the redemption of stocks in the hands of sub-pledgees, over and above that involved in the payment of customers' debit balances, would have to be averaged between the stocks of all classes of margin customers, including the firm and its members.

Where a customer had deposited his own stocks with the firm as security for his margins, and these stocks had been re-hypothecated, there appearing to have been no express or implied authority for such re-hypothecation, the customer attempting to redeem such stocks would be entitled to a priority over other customers whose stocks had been hypothecated with his.

An administratrix who left with the firm for sale bonds registered in the name of the deceased and accompanied with a power to transfer signed by her as administratrix, and who was able to trace the proceeds of the sale into the hands of the trustee, was held entitled to recover the same as trust funds.

The case of *Ingraham* v. *Taylor*, 55 Conn., 503, commented on.

[Argued January 24th—decided June 7th, 1893.]

ACTIONS by sundry claimants on the insolvent and assigned estate of Bunnell & Scranton, who had been bankers and brokers in New Haven, the defendant being the trustee in insolvency. The plaintiffs were creditors by virtue of deposits of money with the firm for the purchase and carrying

by them for the depositors of stock, in the New York market, and claimed a right to the stocks so far as they could be traced. The defendant represented the interests of the general depositors and creditors. The claimants had united in an amicable proceeding, under an arrangement by which they were to apportion the amount recovered equitably among themselves. The action was brought to the Superior Court in New Haven County, and referred to a committee, upon whose finding of the facts the case was reserved for the advice of this court. The facts are fully stated in the opinion.

The following counsel argued or filed briefs for the different plaintiffs : *J. W. Alling, J. H. Webb, H. C. White, O. S. White, L. M. Daggett, H. G. Newton, E. B. Gager, W. H. Williams, D. G. Watrous, D. Stouse,* and *E. J. Buckland.*

*H. Stoddard* and *J. W. Bristol,* for the defendant.

PRENTICE, J.   H. H. Bunnell and C. W. Scranton, under the name of Bunnell & Scranton, were for more than twenty years bankers and brokers, having their office in New Haven. In their banking department they received deposits and conducted a private banking business in the usual manner. In their brokerage department they bought, sold and exchanged stocks, bonds and other securities or evidences of title to personal property of various kinds, upon their own account and for others, upon commission, after the usual custom of stockbrokers in this state and the state of New York. By far the largest part of their business consisted in executing the orders of their customers to buy and sell upon margins. Many persons so dealt with them, and among them were the plaintiffs. The firm and its individual members also dealt in the market upon their own account.

On May 16th, 1891, Bunnell died. Four days later his surviving partner made an assignment in insolvency of the partnership estate and likewise of his individual estate. The defendant is the trustee upon both estates, which are now in process of settlement.

At the time of the assignment Bunnell & Scranton, by reason of the orders of their margin customers and of their own margin dealings, were in some manner carrying various stocks and securities. A few of them were in their own hands, others in the hands of pledgees from them, and others still in the hands of their New York agents, who held them as security for advances to the insolvent firm. The firm kept an account with each of their customers, in which they charged the purchase price of all stocks and securities ordered by them, the commission thereon, and interest on debit balances, and credited the selling price of what was ordered sold, margins paid, and dividends received. A settlement of these accounts, after crediting to each customer the market price of stocks and securities not closed out, shows a credit balance to the plaintiffs. These customers we will, for convenience sake, call creditor customers. A like settlement shows that other customers, whom we will call debtor customers, were indebted to the firm. Before this final credit is made, the accounts of all, save one or two customers, show an apparent indebtedness. The stocks and securities of the various kinds carried as aforesaid were not sufficient to fill the orders of all the firm's customers.

The plaintiffs desire to pay their debit balances and redeem the stocks and securities which they have ordered bought. The defendant contests their right so to do. They have therefore united in the present action, which is amicable in its character, for the purpose of obtaining the advice of this court upon the questions which relate to the contention between the several plaintiffs and the defendant.

The record sets out in full the details of the dealings of each customer, the state of his account at the time of the assignment, the various kinds and amounts of property called for by his orders, the kinds and amounts of property carried by Bunnell & Scranton as the result of these orders, and the manner in which that property was holden in sub-pledge.

We are not asked to determine all the questions which might upon the facts arise between the plaintiffs themselves. As between themselves they profess to be able to make a

satisfactory distribution of the property which may fall to their share and of the burdens it must bear.   We are therefore left to the consideration of those questions only which grow out of the rights or interests of the trustee as against the plaintiffs.   These questions relate—(1) to the plaintiffs' claimed right of redemption; and (2) to the conditions, if any, upon which redemption may be made.

Since the appointment of the trustee most of the stocks and securities which were being carried by Bunnell & Scranton have, pursuant to an agreement made by the parties in interest, been sold and turned into money, which is now held in lieu of the property sold and under the same conditions. The questions presented by the record relate to the situation as it was when Bunnell & Scranton assigned, and we shall treat of the facts as they then were and as they in legal contemplation continue to be.

The mode of dealing between Bunnell & Scranton and their customers, and by Bunnell & Scranton in the execution of the orders of their customers, is set out in the record, with a careful attention to detail, as follows :—

The course of business of Bunnell & Scranton in receiving and executing orders from customers was as follows.   The customer desiring to deal in stocks or other property was required to sign and deliver to Bunnell & Scranton an order, upon a printed blank supplied by them, of which the following is a copy :

"BANKING HOUSE OF BUNNELL & SCRANTON,

"NEW HAVEN, Conn.,            18

"Please            for my account and risk            shares

order good until countermanded.   It is agreed that Bunnell & Scranton have the right to dispose of, without notice, all stocks, bonds, petroleum and grain purchased or sold on margin, whenever said margin is reduced to two per cent."

When the customer's order to purchase or sell had been executed in the manner hereinafter stated, Bunnell & Scranton sent him a notice advising him thereof, upon a printed blank, of which the following are copies :

" OFFICE OF BUNNELL & SCRANTON,
    "No. 108 ORANGE ST., NEW HAVEN, CONN.
                    NEW HAVEN,      18

" Mr._____*Dear Sir :*—We have this day bought for
your account and risk_____

_____

        " Yours respectfully, BUNNELL & SCRANTON."

" OFFICE OF BUNNELL & SCRANTON,
    " No. 108 ORANGE ST., NEW HAVEN, CONN.
                   " NEW HAVEN,      18

" Mr._____*Dear Sir :*—We have this day sold for your
account and risk_____

_____

        " Yours respectfully, BUNNELL & SCRANTON."

If the customer desired the delivery of the certificate or
other proper evidence of title to the property ordered to be
purchased, such certificate or evidence of title of such secu-
rity or property was obtained by the firm and delivered to
him upon payment to them of the purchase price and com-
mission. If the transaction was to be upon margin, then the
customer giving such order was required to place and keep
with the firm cash or securities equal to a stipulated per
cent of the par value of the securities or property ordered
by such customer to be bought, which deposit was called a
' margin.'

When stocks were ordered to be purchased upon margin,
the certificate or other evidence of title of the property thus
ordered to be purchased was not delivered to the customer,
but was held and made use of as hereinafter set out.

It was understood between the customer and Bunnell &
Scranton that the certificates of the property should not
be delivered to the customer until the price thereof, with
interest thereon and commission, was paid. It was also
understood that Bunnell & Scranton might, under certain
circumstances, sell the securities thus carried to protect them-
selves from loss. Subject to such right, it was agreed that
the brokers would carry the property for the customer at the

risk of such customer, and that they would sell the same forthwith, upon the order of the customer, and account to him for the proceeds; or, upon payment in full of the purchase price of the property, and all sums due for interest and commissions, that they would deliver to the customer a certificate or other proper evidence of title to the property. This is the usual agreement between brokers and their customers when stock is dealt in upon a margin.

While the firm of Bunnell & Scranton continued in business they never failed to respond to any order or request to deliver or sell certificates of stock or other property which they had purchased for their customers.

They received for their services as brokers one eighth of one per cent of the par value of the security bought or sold, and received no other profit from the transaction. They kept an account with each customer, on which he was credited with all cash payments, including payments by way of margin, and with the proceeds of all sales, less commissions, and with dividends when paid upon stocks carried for him, and was charged with the full price of securities ordered and carried, with the commissions added and with interest on such price.

All orders for the purchase or sale of stocks (except as may hereinafter appear) were executed by Bunnell & Scranton through Prince & Whitely and W. S. Lawson & Company, two firms of brokers and members of the stock exchange in the city of New York; and this fact was well known to the plaintiffs and to the customers generally of Bunnell & Scranton.

Such orders were so executed in the following manner, to wit:—the firm of Bunnell & Scranton were required to place and keep in the hands or under the control of said Prince & Whitely and Lawson & Company, respectively, money and marketable securities by way of margin, in amount equal to a stipulated per cent of the par value of the securities ordered by Bunnell & Scranton and bought or sold through said New York brokers respectively. The margin required by Prince & Whitely was ten per cent, and that re-

quired by Lawson & Company was five per cent.  There-
upon Bunnell & Scranton, when they received orders from
their customers to buy or sell securities or other property,
ordered by telegraph Prince & Whitely or Lawson & Com-
pany to buy or sell on the account and at the risk of Bun-
nell & Scranton the various securities or property which
they had by their customers been so ordered to buy or sell.

The New York brokers did not deal with or know the
customers of Bunnell & Scranton, but dealt with Bunnell
& Scranton exclusively; although they knew that Bunnell
& Scranton were in the brokerage business, and understood
generally that a large proportion of the orders of Bunnell &
Scranton to them were in fact in execution of orders receiv-
ed by that firm from their customers.

Upon the receipt of such telegram from Bunnell & Scran-
ton the New York brokers, in execution of such order, in
their own name and behalf, and not disclosing that they
were so executing the orders of Bunnell & Scranton, bought
of or sold to some other broker and member of the stock ex-
change of the city of New York the security or property
which they had been so ordered by Bunnell & Scranton to
buy or sell.

The rules of the stock exchange require that all purchases
or sales made by the brokers belonging to said exchange
shall be actual, *bonâ fide* transactions, and in every instance
such transactions were actual transactions, and were accom-
panied by the actual delivery of certificates, with an assign-
ment and power of attorney for transfer, executed in blank,
or other evidence of title, and the property was paid for on
delivery.   One exception, however, occasionally occurred
in the course of dealing, to wit :—if the brokers during the
day's business in the stock exchange bought of another
broker stock or property, and also sold to the same broker
stock or property of the same kind, in settling these trans-
actions at the end of the day they did not deliver to him
certificates or evidences of title for the full number of
shares of such stock sold to him, and receive from him cer-
tificates or evidences of title for the full number of shares

thereof bought of him, but, following what was the custom of brokers under such circumstances, delivered to him or received of him, as the case might be, certificates or other evidence of title for such number of shares only as would balance their dealings on that day in that kind of stock or property. If the number of shares bought of such broker and the number of shares sold to him were the same, then the transactions were settled by an exchange of checks, they giving to such broker their check for the purchase price of all stock bought of him, and receiving from him his check for the purchase price of all stock sold to him, and no certificate or other evidence of title of that kind of stock passed between the parties.

Whenever any order of Bunnell & Scranton was so executed by Prince & Whitely or by Lawson & Company they notified Bunnell & Scranton by sending them a telegram, and afterwards a written report, stating the date, kind and amount and price of the securities so bought and sold, and the name of the broker from or to whom such purchase or sale was made.

Whenever a telegram was received from either of the New York brokers announcing the execution of an order Bunnell & Scranton were accustomed to mark upon the telegram the name of the customer on whose account such order was executed; and in like manner when the written report containing the same announcement was received the name of such customer was marked on the letter. From these memoranda the charges and credits were made upon the books of the firm in the account of such customer.

For their services the New York brokers charged Bunnell & Scranton a commission of one sixteenth of one per cent of the par value of all securities bought or sold.

Each of said New York brokers, Prince & Whitely and Lawson & Company, kept a general account with Bunnell & Scranton, upon which the price of all securities so bought, together with the commissions and interest upon balances, was charged, and the proceeds of securities sold, dividends received upon securities carried for them, and all cash pay-

ments, including payments made by way of margin, were credited.

The certificates and evidences of title of property thus bought by the New York brokers, by order of Bunnell & Scranton, upon a margin, were not delivered to Bunnell & Scranton, but were received and held or made use of by the New York brokers in the manner hereinafter set out. It was understood between Bunnell & Scranton and the New York brokers that such certificates and evidences of title to property should not be delivered to Bunnell & Scranton until the purchase price thereof, with interest thereon and commission, was paid. It was also understood that the New York brokers might, under certain circumstances, sell the securities thus carried, to protect themselves from loss. Subject to such right it was agreed that the brokers would carry the property for Bunnell & Scranton at the risk of Bunnell & Scranton, and that they would sell the same forthwith upon the order of Bunnell & Scranton and account to them for the proceeds; or, upon payment in full of the price at which the property had been purchased, and all sums due for interest and commissions, that they would deliver to Bunnell & Scranton a certificate or other proper evidence of title to the property. This is the usual agreement between brokers and their customers when stocks are dealt in upon a margin.

During the whole course of their business with Bunnell & Scranton, which had been continuous with both firms for many years prior to the assignment of Bunnell & Scranton, there had never been a case where the New York brokers had not complied with the order or request of Bunnell & Scranton to deliver in New Haven any stocks or other property which they had previously reported that they had purchased, and at all times from the beginning of their business with Bunnell & Scranton to the present time they have been able to meet all their obligations.

When the New York brokers purchased securities upon the order of Bunnell & Scranton, as aforesaid, they entered upon their books the number of the certificate or other evi-

dence of title delivered to them, but thereafter they did not keep separate or distinct such evidences of title from others of the same kind received in the course of business in executing orders of other customers; and they used for the purpose of delivery upon sales made by them in the course of their business, such as were most convenient for them to use, without regard to any right of the customer in or to any particular certificate or evidence of title, and without regard to the fact that the particular stock represented by any given certificate or evidence of title was purchased upon order of one customer or another. Except as may be hereinafter specially found, the certificates and other evidences of title of property in the possession and control of the New York brokers at the time of the assignment, as hereinafter set out, and held for and on account of purchasers on margin for said firm, were not the same which were received upon the execution of such orders of Bunnell & Scranton. The custom of the brokers in the above respect is in accordance with the general custom of brokers.

It is the custom of brokers at their pleasure to pledge or hypothecate the certificates or other evidences of title delivered to them in the execution of orders to buy stocks on margin, for the purpose of raising money to carry on their business, and Prince & Whitely and Lawson & Company were accustomed to and did pledge and hypothecate, at their pleasure, the certificates and evidences of title received in executing the orders of Bunnell & Scranton.

It sometimes happened in the course of their business that the brokers were ordered by a customer to sell stock or property which they were not carrying for him, and which was not furnished to them by him for delivery. In such case it was their custom to borrow the requisite certificate of another broker, and to use the same to deliver in execution of such order to sell. But if the brokers were carrying sufficient of such stock or property for some other customer, they in such case used the stock so carried, and delivered the same in execution of such order to sell; and it thus happened that, until an equal amount of such stock was bought back or re-

placed by borrowing, they did not have in their possession or control sufficient of that particular kind of property required to enable them to make delivery to the person for whom they were bound to carry such stock on margin.

With the exception that the above occasionally occurred, Prince & Whitely and Lawson & Company at all times had and retained in their possession, or had in the possession of banks where the same had been pledged by them in such manner that they could control and at all times redeem the same, sufficient of the particular kinds of property required to enable them to perform their contracts with Bunnell & Scranton and their other customers, which property they so held and controlled for that purpose; and said brokers were at all times so situated that if at any time they had not so in their possession or control sufficient of any particular kind of property, they could at once obtain the same by buying or borrowing.

In some few instances, as will hereinafter appear, Prince & Whitely had in their actual possession at the time of the assignment of Bunnell & Scranton certain certificates which had been so received by them at the time of the execution of orders of Bunnell & Scranton. Such identical certificates were not so held because of any contract or understanding with Bunnell & Scranton, other than that which governed the general dealings of the parties as herein set out.

Upon the execution of the orders of Bunnell & Scranton by the New York brokers the price of the security sold or bought was, if sold, credited, or if bought, charged, in the margin account of Bunnell & Scranton, and separate payments and separate deposits by way of margin were not made by Bunnell & Scranton on account of the different purchases made upon such orders.

Occasionally during the continuance of this business between Bunnell & Scranton and Prince & Whitely and Lawson & Company the margin which Bunnell & Scranton had with Prince & Whitely or Lawson & Company was more than the stipulated per cent of the current securities which had been ordered bought or sold by Bunnell & Scranton, and

therefore Prince & Whitely or Lawson & Company, upon the request of Bunnell & Scranton, sent to Bunnell & Scranton a certificate of stock or other evidence of title, and thus reduced the margin of Bunnell & Scranton with the New York brokers. Whenever such margin with Prince & Whitely or Lawson & Company was reduced below the required per cent, Bunnell & Scranton replenished such margin by check or draft drawn to the order of the New York brokers on the banks where Bunnell & Scranton kept on deposit the cash received in carrying on their banking and brokerage business.

Whenever any certificates or evidences of title of the stocks or property carried by them for their customers came into the actual possession of Bunnell & Scranton they held, pledged and made use of the same in the same manner that the New York brokers held, pledged and made use of the certificates and evidences of title received by them in the execution of orders of Bunnell & Scranton, as hereinbefore set out. No particular certificate or other evidence of title of property carried on margin was kept or held by Bunnell & Scranton for delivery to any particular customer.

The finding, which we have thus far quoted, thus sets out at length the history of the transactions between Bunnell & Scranton and the plaintiffs, their customers, which has culminated in the situation before us. It is apparent that a solution of its problems will be largely determined by the construction which is to be placed upon the contract between the parties, and upon the relation or relations sustained by them to each other as the result of their dealings.

That the contract between Bunnell & Scranton and the plaintiffs was an illegal one, and that their relations were such as are forbidden in law, is not contended. The decisions of this court have removed this question from the domain of doubt. *Hatch* v. *Douglass*, 48 Conn., 116 ; *Ingraham* v. *Taylor*, 58 id., 503.

The defendant's contention is, that the relation between Bunnell & Scranton and their customers was a contract relation pure and simple, and that the contract was such that no right, title or interest in or to any of the securities ordered

by a customer upon a margin and not in fact delivered to
him ever vested in him, for the reason that the contract was
wholly executory, dependent and conditional.  The claim of
the defendant's brief is that the contract was merely one to
deliver upon payment in full by the customer.  That this
statement of the contract is intended to be exhaustive and
not merely expressive of the salient feature of the undertak-
ing of the parties, clearly appears from the extended discus-
sion given to the subject.  The contract thus interpreted
resolves itself into one of comparatively simple terms.  The
customer, in consideration of his payments, purchased the
right to have delivery made to him, at any time at his op-
tion, of certain designated stocks or securities, at the price
of the day of the agreement.  Bunnell & Scranton's under-
taking was to make such delivery, upon demand and the re-
quired payment.  The agreement in this form, it will be
observed, did not call upon Bunnell & Scranton to do any-
thing but to deliver upon demand and condition of payment
complied with.  There was involved no duty to buy any
stocks or securities until delivery was called for, and none
at any time to carry any for the fulfillment of the contract.

If we turn to the record to discover what the expressed
terms of the contract between Bunnell & Scranton and their
margin customers were, and what was in fact done, either in
execution or by reason of them, we find that the first step in
each transaction was the execution by the customer of a
written order to buy for his account and risk.  The order
being accepted, Bunnell & Scranton forthwith, through their
New York agents, went into the market and bought the
stock or securities ordered.  They received from the seller
the certificate or proper evidence of title and paid the pur-
chase price.  The purchase made, Bunnell & Scranton at
once notified the customer that they had bought for his ac-
count and risk.  They charged him with the cost.  There-
after, until the transaction was in some manner closed, they
continued (save as a course of dealing carried on pursuant to
a custom of the business caused occasional temporary ex-
ceptions) to hold and carry said shares or securities, or an

equal amount of other like shares or securities, ready for delivery when required. The risk attending this carrying was the customer's. He paid interest upon the moneys furnished by Bunnell & Scranton to pay for the stocks or securities bought by them. The right at any moment to command a sale and have an accounting for the proceeds was his. He received an accounting for the dividends. Bunnell & Scranton were entitled to no benefit or profit from the transactions excepting their commissions. This mode of dealing, in the execution of orders of the kind in question, was in accordance with the uniform and recognized custom of the stock market in Connecticut and New York, where the parties dealt.

The difficulties attending an attempt to harmonize this language of margin-purchasing orders, and the uniform conduct of the parties in their execution, with the contract as the defendant asks that it be interpreted are apparent. The orders, in unmistakable terms, directed purchases of stocks and securities for the account and risk of the customer, and Bunnell & Scranton advised the customer that they had been so bought. The defendant is compelled, in justification of his definition, to say that this use of language was false and misleading, and that no buying was, in fact, by the contract contemplated or required.

There was in every instance, conformably to the language of the order and notice, an actual and immediate buying and acquisition of the stocks and securities designated. The defendant says that this conformity of practice with the language of the order was accidental. He insists that the buying was the voluntary and gratuitous act of Bunnell & Scranton, and not the result of any obligation upon them to buy. He says that they bought only because they were prompted so to do by "ordinary business prudence," in order that they might be protected from the fluctuations of the market. This explanation is good as far as it goes. But there is still left unexplained and apparently unexplainable the uniform practice of charging to the customer the cost of that which the broker's business prudence alone prompted

him to procure to enable him to fulfill his contract without risk to himself, and the willingness of the customer to pay interest upon the investment which was not for him or in his interest. If this payment of interest by the customer was voluntary, it would seem that it must have been made under the impulse of a generosity as striking as it was universal. If it was agreed, it would seem that the thing which justified it, to wit, the purchase which caused the expenditure, must have been within the scope of the agreement.

These are not the only inexplicable features of the situation under the contract as sought to be interpreted. It is said that the margin broker buys under the dictation of " ordinary business prudence," that he may not be subjected to risks attending changes in the market. It would be natural to expect that an occasional customer, at least, would be actuated by the same prudence. The defendant, however, would have us believe that the hazards of the market, which have frightened all brokers into a rigorous conservatism, have been without effect upon the customer, so that he cheerfully assumes all the risk attending a carrying of stocks and securities which he has not called for and to which the broker has resorted for his own benefit solely. The conduct of the broker in its turn is no less strange. The stocks and securities are his, but he generously accounts to the customer, who has no interest whatever in them, for the dividends and income, and graciously permits him to direct a sale at any time and to command an accounting for the proceeds.

We are convinced that the defendant's statement of the undertaking of the parties does not satisfy the requirements of the situation. Clearly it is incomplete in detail, or wrong in its fundamental principle.

If we look for judicial sanction for the proposition of the defendant we find none outside of the Supreme Court of Massachusetts, and no present authority there for the precise interpretation here contended for. In *Hayes* v. *Wood*, 15 Gray, 375, which was decided in 1860, before the stockbroker was as familiar a figure as he is to-day, and before the law governing his calling was as well established, that court

devoted a few lines only to this subject, but gave countenance to the defendant's claim in that it said of a margin-purchasing contract that it was strictly a conditional one, to deliver so many shares upon the payment of so much money, and that until the money was paid the right to have performance did not accrue.

In the later case of *Covell* v. *Loud*, 135 Mass., 41, the court made it clear that it did not regard the statement of the contract in *Hayes* v. *Wood* exhaustive, but simply as expressive of its distinctive feature. It apparently did not intend to adopt a new position as respects what was the distinctive feature of the contract, since it cited approvingly the language of the former case; but it did, in plain terms, state that there was incorporated into the contract an agreement on the part of the broker " to purchase and hold or carry " for the customer. In neither of these cases is the matter under consideration treated at any length, and it is not altogether easy to gather from them just what the court's construction of the undertaking of the parties in its full scope was. If we interpret their language aright, their doctrine is, substantially, that the broker in margin-purchasing contracts like those under consideration, agrees, in consideration of the customer's payments, to purchase certain stocks or securities and hold or carry them, or an equal number of like shares or securities, ready to be delivered to the customer when required by him, and upon demand and payment therefor to deliver the same to him.

This enlarged construction of the contract, in so far as it brings within its scope what by established usage is done in its execution, obviates to that extent, of course, the inconsistencies which we have commented upon as existing between obligation and performance. Doubtless the construction might be so far elaborated as to embrace within the terms of the contract all the features which characterize the course of dealing under it. The result, however, would not then be to remove the difficulties attending the situation. The inconsistencies and incongruities, to be sure, would no longer arise from without, but they would still continue to

exist within the contract and be as inexplicable as ever. The contract would become one inharmonious and inconsistent in its parts. So long as the interpretation of the contract preserves as its distinctive feature the principal proposition that the customer purchases merely the right to have delivery to him in the future, at his option, of stocks or securities at the price of the day of the agreement, and its corollary that the customer derives no right, title or interest in the stocks or securities until final performance, the difficulties in the way of harmonizing the situation are bound to exist. The fundamental difficulty grows out of the necessary attempt in some way to transform the customer, who enjoys all the incidents and assumes all the risks of ownership, into a person who in fact has no right, title or interest, and to create out of the broker, who enjoys none of the incidents of ownership, and assumes not a particle of its responsibility, a person clothed with a full title and an absolute ownership.

The details of the transactions between the plaintiffs and Bunnell & Scranton, from their inception down to the point where the stocks and securities were purchased and procured, were precisely those which characterize stock-brokerage dealings in their commonly accepted form. Had delivery to the plaintiffs followed no one could fail to recognize the transactions thus far as the usual ones between customer and broker. In this situation, if the plaintiffs had simply handed back to Bunnell & Scranton the stocks or securities so delivered, to be held by the latter as security for any indebtedness from the former to the latter, whether incurred in the purchase or otherwise, until such time as that indebtedness and the interest thereon should be paid, these latter transactions would have been unmistakable ones of pledge. These two relations of customer and broker, and pledgeor and pledgee, together with their nature and incidents, are well undertsood. Wherein does the combination in succession of these two relations fail to satisfy the conditions existing between Bunnell & Scranton and the plaintiffs? Clearly in no possible particular unless it be either

because there was no delivery, in the first instance, to the plaintiffs as buyers, and no redelivery by them to Bunnell & Scranton as pledgees; or, because Bunnell & Scranton enjoyed certain privileges with, or exercised certain rights over, the purchased property which do not belong to pledgees.

That the omission of the superfluous acts of delivery and redelivery cannot operate to effect radical changes in the legal relations of the parties seems too apparent for argument. The law seeks substance, not forms. It never requires the performance of a needless act. The juggle of a pass from Bunnell & Scranton through their customer back to them again would have satisfied in technical detail all the requirements of the completion of a purchase and the inception of a pledge. The result was obtained by omitting this useless performance which the law regards the parties to have waived. It is a well recognized principle of law that formal manual delivery is not a necessary pre-requisite of a pledge. " If the pledgee has the thing already in his possession, the very contract transfers to him by operation of law a virtual possession thereof as a pledge the moment the contract is completed." *Markham* v. *Jandon*, 41 N. York, 235; *Brown* v. *Warren*, 43 N. Hamp., 430; *Providence Thread Co.* v. *Aldrich*, 12 R. Isl., 77; Story on Bailments, § 297.

The privileges which Bunnell & Scranton enjoyed and the rights which they exercised over the stocks in their hands, which are inconsistent with the ordinary privileges and rights of a pledgee, may be said to have been :—

1. That they did not retain the identical shares bought for each customer and keep them separate and apart from the general mass of like stocks carried by them.

2. That they exercised the right to repledge at will; and

3. That they occasionally, by reason of their short sales for other customers, reduced their carrying of certain stocks below the requirements of their customers.

It is well established that a pledgee of stocks is entitled to have them transferred upon the books of the corporation

into his own name. *First Nat. Bank* v. *Hartford Life & Annuity Insurance Co.*, 45 Conn., 22; General Statutes, § 1924.

Shares of stock have no individuality, no earmarks. One share does not differ from another share of like stock in form, characteristic or value. Each share represents simply an undivided proportionate interest in the ownership of the corporation. It entitles its owner to a certain right in the management, profits and ultimate assets of the corporation, precisely like that which every other shareowner enjoys. Certificates of stock, which have earmarks, are not the stocks. They are only the evidence of the ownership of the stocks. They are muniments of title like title deeds. They have no value save as evidence of the thing owned, which has nothing individual, distinguishable or peculiar about it. Courts have therefore said that no good reason existed for requiring that a pledgee of stocks should at all times preserve a careful separation of distinguishable certificates connected with each transaction of pledge, and maintain the identity of each certificate distinct and unbroken. They have said that the essential thing was that he hold at all times the required shares of stock ready to be delivered when called for, and in recognition of this fact and of the right enjoyed by the pledgee to transfer the stocks held by him in pledge into his own name, they have held that a pledgee fully preserves the rights of the pledgeor if he at all times until the termination of the pledge retains similar stock in amount equal to that pledged. This has been held of pledges in their ordinary form as well as of those incidental to margin transactions. *Nourse* v. *Prime*, 4 Johns. Ch., 490; *Horton* v. *Morgan*, 19 N. York, 170; *Gilpin* v. *Howell*, 5 Penn. St., 41; *Price* v. *Gover*, 40 Md., 102; *Hubbell* v. *Drexel*, 11 Fed. Rep., 115; Cook on Stock & Stockholders, § 469.

The right to re-pledge for his own debt is clearly one not enjoyed by a common law pledgee. Bunnell & Scranton undoubtedly exercised it over the stocks and securities in their hands for the purpose of obtaining the capital required to carry their customers' purchases. They even went so far

as to pledge the stocks and securities of one customer *en bloc* with those of other customers. This course of dealing, however, was in conformity with the established custom and usage in the stock market in Connecticut and New York. When the plaintiffs gave their orders to Bunnell & Scranton they understood that the orders were for execution in the New York Stock Exchange. They knew the relation of Bunnell & Scranton to this exchange and their mode of transacting business therein through New York houses, members thereof. They must therefore be held to have contemplated and authorized a course of dealing in accordance with the rules and customs of that market. The authorities are not uniform as to the effect of trade usages upon the contractual obligations of parties. We think, however, that the better authority goes to this extent, at least, that when one employs another to deal in a particular market he will be held as intending that the mode of performance should be in accordance with the established customs and usages of that market, as long as the custom or usage is neither immoral, unlawful, unreasonable, contrary to the express agreement of the parties, nor such as to change the intrinsic character of the undertaking. *Robinson* v. *Mollett*, L. R., 7 H. L., 802; *Nourse* v. *Prime*, 4 Johns. Ch., 490; *Lawrence* v. *Maxwell*, 53 N. York, 19; *Samuels* v. *Oliver*, 130 Ill., 73.

In view of the character and necessities of the business undertaken by brokers in carrying for their customers stocks bought upon a margin, and of the purposes which the custom of repledging was intended to serve, we are not prepared to say that it is open to any of the enumerated objections. Courts have commonly sanctioned it. *Nourse* v. *Prime*, 4 Johns. Ch., 490; *Lawrence* v. *Maxwell*, 53 N. York, 19; *Oregon Co.* v. *Hillmers*, 20 Fed. Rep., 717; Dos Passos on Stockbrokers, 357; 18 Am. & Eng. Ency. of Law, 707.

This custom therefore became a part of the contract between Bunnell & Scranton and their customers. The contract thus gave to Bunnell & Scranton the implied authority to re-pledge. Such authority it has long been recognized could be given by a pledgeor. *Ogden* v. *Lathrop*, 65 N. York,

158; *Price* v. *Gover*, 40 Md., 102; Dos Passos on Stock-brokers, 662; Story on Agency, § 113.

The custom which countenances the practice of using stocks and securities carried for margin-buyers in effecting sales for other short-sale customers, so that the amounts of certain stocks carried are at times reduced below the requirements of the purchasing customers, stands upon a different footing and appears to have less justification. We are not called upon here to determine the question, which might under certain circumstances be an important one, whether such custom is or is not reasonable or consistent with the intrinsic character of a margin-buying contract. The purpose of our present inquiry is to discover what harmony, or want of harmony, exists between the actual course of dealing and the contractual obligations and rights of the parties as a test of interpretation. In this aspect the custom under consideration has little significance, since it would seem to be no less unreasonable and incongruous when followed by one who has contracted " to purchase and hold or carry," than when followed by a pledgee. In any event, although the practice be regarded as one which usage alone will not be permitted to attach to the pledge relation, it appears as the only feature of the whole course of dealing between the parties out of harmony with that relation. So much cannot be said of any other relation.

The leading case upon this subject in New York is *Markham* v. *Jaudon*, 41 N. York, 235. The opinion of the court in that case, delivered by Chief Justice Hunt, contains an analysis of the obligations of the parties to a margin-purchasing contract which is so exhaustive and so in consonance with our views, in so far as it relates to the questions involved in this case, that we quote it in full, together with some further pertinent observations of the court, as follows :—

" The broker undertakes and agrees :—

" 1. At once to buy for the customer the stocks indicated ;

" 2. To advance all the money required for the purchase beyond the ten per cent furnished by the customer ;

" 3. To carry or hold such stocks for the benefit of the

customer so long as the margin of ten per cent is kept good, or until notice is given by either party that the transaction must be closed. An appreciation in the value of the stocks is the gain of the customer and not of the broker;

" 4. At all times to have in his name and under his control ready for delivery the shares purchased, or an equal amount of other shares of the same stock;

" 5. To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker; or,—

" 6. To sell such shares, upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale.

" Under this contract the customer undertakes:—

" 1. To pay a margin of ten per cent on the current market value of the shares;

" 2. To keep good such margin according to the fluctuations of the market;

" 3. To take the shares so purchased on his order whenever required by the broker, and to pay the difference between the percentage advanced by him and the amount paid therefor by the broker.

" The position of the broker is two-fold. Upon the order of the customer he purchases shares of stocks desired by him. This is a clear act of agency. To complete the purchase he advances from his own funds, for the benefit of the purchaser, ninety per cent of the purchase money. Quite as clearly he does not in this act as an agent, but assumes a new position. He also holds or carries the stock for the benefit of the purchaser until a sale is made by the order of the purchaser or upon his own action. In thus holding or carrying he stands also upon a different ground from that of a broker or agent whose office is simply to buy and sell. To advance money for the purchase, and to hold and carry stocks, is not the act of a broker as such. In so doing he enters upon a new duty, obtains other rights, and is subject to additional responsibilities."

The conclusion of the court is that this new relation is that of pledgeor and pledgee.

This doctrine has been adopted and approved by a long line of New York cases, among which are the following :— *Stenton* v. *Jerome*, 54 N. York, 480 ; *Baker* v. *Drake*, 66 id., 518 ; *Grumann* v. *Smith*, 81 id., 25 ; *Capron* v. *Thompson*, 86 id., 418 ; *Gillett* v. *Whiting*, 120 id., 402 ; *Willard* v. *White*, 56 Hun, 581.

The Supreme Court of Illinois has held in accordance with the rule in New York. *Brewster* v. *Van Liew*, 119 Ill., 554. The text writers have adopted this view. Dos Passos on Stockbrokers, 112 ; Cook on Stock & Stockholders, § 457 ; Jones on Pledge, 495 ; 18 Am. & Eng. Ency. of Law, 707; Colebrook on Collateral Securities, § 306 ; Overton on Liens, 205.

It only remains to notice the former decisions of this court. The case of *Hatch* v. *Douglass*, 48 Conn., 116, arose out of conditions which, as respects the contract relations of the parties, were precisely similar to those existing between the parties to the present action. In that case, however, the plaintiffs, the brokers, sought to recover from the defendant, their customer, upon a balance of account. The issues did not directly involve any questions as to the ownership of stocks and did not necessitate a definition in precise terms of the relation which the parties bore to each other while stocks were being carried. The opinion therefore contains no designation of the relation. It is however explicit in its determination of what the nature of the employment was, and uses language which admits of no uncertainty as to the court's conception of the relation of the parties. " The defendant," it says, " through his agents, the plaintiffs, actually purchased the stock, and there was an actual delivery—not to the principal, but to the agents for the principal. The plaintiffs advanced the money and held the stock in their hands as security. The plaintiffs were ready at any time to transfer the stock to the defendant upon payment of the purchase money. The import of the finding is, and we must so regard it, that it was an actual and *bonâ fide* employment of

the plaintiffs to purchase stocks, and not a mere formal employment designed to cover a betting operation." It is thus held that the employment was an actual and *bonâ fide* one to purchase stocks; that there was an actual purchase for the customer; that the brokers were, for the purposes of the purchase, the agents of the customer; that the delivery was to the brokers as such agents; that the brokers advanced the money to effect the purchase; and that they held the purchased stocks as security for such advances. The picture thus drawn of the plaintiffs as the defendant's brokers and subsequent pledgees could hardly be more unmistakable if it had been given its proper name. The court's statement of the elements of the transaction certainly excludes every possibility of a relation wherein the customer is not a buyer and the broker not an agent, and that too an agent of the customer, and wherein the purchased stocks are held by the broker by virtue of an ownership by him and not merely as security. Under the defendant's contention the customer is not a buyer, the broker is a principal and not an agent, and the purchased stocks are the latter's by an absolute title. The more carefully this case is analyzed the more apparent it becomes that it is decisive of the question under discussion, and that its doctrine is in full harmony with that which we here sanction.

In *Ingraham* v. *Taylor*, 58 Conn., 503, margin contracts were again under consideration. In their outward form the contracts in that case were like those in *Hatch* v. *Douglass* and in this case. The transactions under them however assumed a totally different character. There was no actual buying. The course of dealing bore none of the earmarks of a *bonâ fide* employment to purchase. The court was therefore naturally led to give a construction to the contracts which would make them conform to what was in fact done in pursuance of them. It must however be confessed that upon close analysis it is difficult to harmonize the language of the court in *Ingraham* v. *Taylor* with the doctrine of *Hatch* v. *Douglass*. We are convinced that the latter case expresses the true rule of law, and in so far as *Ingraham* v. *Taylor* may

be inconsistent with it, and consequently with the principles herein laid down, it is overruled.

We are of the opinion that both reason and authority support the proposition that the relation of pledgeor and pledgee existed between the plaintiffs and Bunnell & Scranton at the time of the latter's insolvency as respects the stocks and securities which they were then carrying for the former in the execution of their orders.

From this proposition it follows that the plaintiffs, as pledgeors of the stocks and securities so carried, are entitled to redeem them. The assignment of Bunnell & Scranton does not interfere with the exercise of this right. The title to the pledged property was never in the insolvents. The plaintiffs have from the first been its general owners. The insolvent firm had only a special property in it. The assignment and appointment of the defendant as trustee in insolvency have never operated to deprive the plaintiffs of their ownership, nor to convert Bunnell & Scranton's interest into an absolute title in the trustee. The defendant trustee is not in the position of a *bonâ fide* purchaser for value. The creditors of the insolvents did not prior to the assignment have the right to appropriate the plaintiffs' stocks and securities to the satisfaction of their claims. The transfer of the stocks into the name of Bunnell & Scranton upon the books of the several corporations did not confer such right. *Mowry* v. *Hawkins*, 57 Conn., 453.

The trustee, in his capacity as a representative of the creditors, cannot therefore have acquired it. By the plaintiffs' exercise of their privilege of redeeming the property the creditors of the pledgees are not deprived of any right or advantage they ever enjoyed. Redemption involves payment of the plaintiffs' several indebtednesses. From these payments the creditors obtain every benefit it was ever theirs to hope for.

An attempt on the part of the several plaintiffs to redeem raises legal questions which demand consideration. These questions relate to the necessity of identification, and the character and extent of that identification. The pledge re-

Skiff v. Stoddard.

lation implies the possession by the pledgee of some property to which the pledge attaches. A pledgeor seeking to retake his own must be able to identify it. The burden is upon him, not only to establish the contract relation, but to point out the property of which the contract gives him the right to re-possess himself upon redemption. In ordinary cases of pledge, where the property given in security is corporeal or consists of certain kinds of choses in action, the means of strict iden-tification are usually at hand. In cases like the present, where the pledged property is made up largely of stocks, the problem of identification becomes complicated by reason of the right in the pledgee to take out in his own name a new certificate and to preserve no separation of particular shares from other like shares held by the pledgee. A strict identi-fication of precise shares is thus oftentimes rendered impos-sible. Nevertheless, both in law and in fact, shares are being held in pledge. Evidently the rule which demands identifi-cation as a pre-requisite to repossession must, when such con-ditions are encountered, receive such reasonable construction and application as will, upon the one hand, satisfy the pur-pose of the rule, and upon the other hand do justice to the parties. It will not do to dispense with the necessity of iden-tification. Neither will it do to suffer a permissible practice on the part of the pledgee to deprive a pledgeor of his prop-erty.

If we look at the conditions which the claims of the several plaintiffs present we find that nearly every possible contin-gency exists. These may be classified as follows :—

1. Where it can be shown that the precise certificates of stock or evidences of title originally purchased in the execu-tion of a plaintiff's order were held for him by Bunnell & Scranton at the time of their assignment.

2. Where it appears that certain particular certificates of stock or evidences of title were by them being carried in ful-fillment of a plaintiff's order, although it may be impossible to establish that such certificates or evidences of title were the precise ones originally purchased in the execution of that order.

3. Where no more precise identification is possible than that Bunnell & Scranton were carrying a block of stocks of a particular kind sufficient to satisfy the demands for that kind of stock of all their customers, including themselves.

4. Where it appears that Bunnell & Scranton were carrying a block of stocks of a particular kind not capable of the precise identification contemplated in classes one and two, and the whole amount of such unidentifiable shares is insufficient to satisfy the demands of all their margin-buying customers, including themselves, but sufficient to satisfy the demands of all such customers exclusive of themselves either as individuals or as a partnership.

5. Where it appears that Bunnell & Scranton were carrying a block of stocks of a particular kind, not capable of the precise identification contemplated in classes one and two, and the whole amount of such unidentifiable shares is insufficient to satisfy the demands of all their margin-buying customers exclusive of themselves either as individuals or as partners.

Classes one and two present no difficulty. The plaintiffs making such identification are clearly entitled to redeem. This identification being a strict one of precise property, it of course follows that it must take precedence of any general identification such as remains to be considered, and gives to the fortunate pledgeor the first right to that which is so identified.

The problem of identification and distribution as related to class three is not a difficult one. If Bunnell & Scranton were at the time of their failure carrying a block of certain stock, and the orders of their customers taken together called for them to carry that amount of stock, the identification of that stock as being stock carried for these customers, the requisite amount for each, is clearly reasonable and sufficient. The shares being all alike, and merely representing an ownership of a certain undivided interest in a corporation, the interests of all concerned are satisfied by a distribution to each pledgeor of his proper number of shares. It has been well said in respect of money that substantial identity does not consist in oneness of pieces of coin or bank bills. *Farmers'*

*& Mechanics' Bank* v. *King*, 57 Penn. St., 202.   It may be as truly said of identity of shares of stock that it does not consist in oneness of certificates.   It is a familiar principle that a fund impressed with a trust may be traced and preserved for its owner so long as it can be identified.   The cases are numerous where it has been held that if money so impressed with a trust is followed into a larger fund, or traced into the deposits of a bank, the identification is sufficient to entitle the owner to take as his own an amount equal to his own so traced.   He does not lose his right to recover his own because he cannot select his particular dollars from the other dollars with which they have become commingled.   It is held to be enough that he establishes that his dollars are there, although their strict identity is lost in a mass of other like dollars. *Knatchbull* v. *Hallett*, L. R., 13 Ch. Div., 713 ; *Nat. Bank* v. *Life Ins. Co.*, 104 U. S. R., 54 ; *Farmers' & Mechanics' Bank* v. *King*, 57 Penn. St., 202 ; *Third Nat. Bank* v. *Stillwater Gas Co.*, 36 Minn., 75 ; *Van Alen* v. *American Nat. Bank*, 52 N. York, 1 ; *Peak* v. *Ellicott*, 30 Kans., 156 ; Beach's Modern Equity, § 283.

This principle with respect to the requirements of identification applied to the shares of stock carried by Bunnell & Scranton leads to the rule of division here laid down.

Class four presents the same problem, modified only by the additional factor that the shares in Bunnell & Scranton's hands were insufficient to meet the demands of their customers and themselves together.   Bunnell & Scranton had the right to do as they pleased with their own.   For their customers they were bound to hold and carry the requisite stocks. If they did not have on hand what was called for by their customers' contracts and their own purchases, it will be presumed, in the absence of evidence to the contrary, that the situation arose in a way consistent with their right and duty, and that the stocks on hand were held for their customers. This presumption however must yield to the fact.   If it appear that certain shares were at the time of the assignment specifically held by the insolvent firm upon the purchases of or for itself or its members, and thus and not otherwise actu-

ally carried, the right thereto of the trustee or administrator of such purchaser and owner would be as clear as that of a plaintiff who is able to make a like strict identification. Should the exercise of this right by the defendant as the representative of Bunnell or Scranton reduce the amount of any kind of stock remaining below that required to satisfy the demands of customers, the distribution would fall under the principles of class five to be considered. Otherwise each customer would take his full quota of stock.

This rule is in consonance with the accepted principles governing the identification and recovery of funds impressed with a trust. *Knatchbull* v. *Hallett*, L. R., 13 Ch. Div., 713 ; *Nat. Bank* v. *Life Ins. Co.*, 104 U. S. R., 54 ; *Continental Nat. Bank* v. *Weems*, 69 Tex., 489.

Class five presents a less simple problem. Our previous discussion has eliminated certain of its features. There remains the single question as to what shall be done when it appears, after all efforts at precise identification have been exhausted, and after the claims of Bunnell & Scranton as purchasers have been cut off, that there remains a block of stock insufficient to meet the demands of all the pledgeors of that stock. There is a shortage which must fall to the loss of somebody. Are there priorities of right as between customers? or must the claims of all fail? or what shall be done to accomplish an equitable result? The customers of Bunnell & Scranton, as we have already seen, divide themselves into two classes—creditor customers and debtor customers. It is claimed that the creditor customers have rights superior to those of the debtor customers, and that the former are entitled to first satisfy their claims for stock, for the reason that the stocks of the latter may be regarded as having practically fallen in to the firm. We think otherwise. At the time of the failure of Bunnell & Scranton all were alike customers for whom stocks were held by the firm in pledge. The legal relation of all to the stocks carried for them was precisely the same. By the appointment of the defendant as trustee the rights of creditors have become interposed. In the presence of their rights it cannot be said that events

which may have succeeded the assignment have operated to give the plaintiffs new and enlarged rights. The situation must be regarded as it existed when the assignment was made. This situation discloses blocks of stock identified as held and carried under pledges for more than one person. None of the stock belongs to Bunnell & Scranton. It is not possible to show to whom it share by share does belong. The shares are all alike. We think that the identification is sufficient to justify, and that equity requires, the division of the stock pro rata, among all those for whom Bunnell & Scranton were holden to carry such stock. This course fully protects the creditors of Bunnell & Scranton. No stock is taken from the assets of the firm to which it was ever by any possibility entitled. It gives the pledgeors their rights, as far may be, and in an equitable manner.

We therefore advise that the plaintiffs are entitled to redeem and possess themselves of such stocks and securities as conformably to the foregoing principles they may be able to thus reasonably identify as being carried for them.

Before the plaintiffs can recover their stocks there must be, of course, a discharge of the several pledges. This discharge implies that the indebtedness of each plaintiff to the insolvent firm must be paid. Unfortunately for the plaintiffs, most of their stocks and securities will not thus become released. They are in the hands of third persons, who rightfully hold them, as security for certain debts of Bunnell & Scranton, and from whom they cannot be taken by their general owners until these debts are satisfied. Most of them thus stand subpledged, together with the stocks and securities of other customers, and oftentimes together with the stocks and securities carried by Bunnell & Scranton themselves as stock operators. The burden incident to the recovery of these stocks so re-hypothecated, in so far as it exceeds that involved in the payment of the plaintiffs' various debit balances upon the insolvents' books, must be borne in some manner by the property held in pledge. Shall it be averaged upon all the property so held, or are there certain stocks and securities which the plaintiffs may rightfully ask

to have first appropriated to this purpose? We have already noticed that the power to re-pledge, as exercised, was impliedly given by the plaintiffs to Bunnell & Scranton. The re-pledging was therefore not wrongful. We have also had occasion to observe that all the stocks and securities which Bunnell & Scranton were carrying for their outside customers were held by them under like conditions, and that the legal relations of all such customers thereto were precisely similar.

As between creditor and debtor customers there clearly exist no priorities. The question, in so far as it affects the stocks of Bunnell & Scranton, presents more complicated considerations. The debts secured by the several pledges are theirs. As against them equity would doubtless give the plaintiffs the right to have an appropriation of the former's portion of the pledged property to the discharge of the pledges before theirs would be used for that purpose. This right, however, is one which should be accorded only as a pure matter of equity. The insolvency introduces into the situation as a new element the rights of creditors, and the plaintiffs' equities must now be determined with regard for their rights. If we look more closely at the circumstances of the pledges we notice that while the debts are Bunnell & Scranton's, they were incurred for the benefit, indirectly at least, of the customers. The nature of the business undertaken by Bunnell & Scranton's customers through them demanded the use of a large capital. The methods employed were designed to enable the customers to have the benefit of such capital without themselves furnishing it. It was not expected that the brokers would have it. It was understood that it was to be obtained in the way it was obtained. The obligation was, to be sure, that of Bunnell & Scranton, but the benefit was, in part at least, the customers.' To secure this benefit, not otherwise easily, if at all, obtainable, the customers were willing that their stocks should be given as collateral. The assignment found them so hypothecated. It found other creditors of the firm. The plaintiffs had, in effect, loaned it the use of their stocks to enable money to

be raised to carry their enterprises. The general creditors had perchance loaned it money with which other stocks had been bought. We think that both classes of customers ought to accept the situation as they find it, and that the plaintiffs are not, under the circumstances, entitled to assert as their equitable right that which would necessarily result in giving them a priority over other creditors. The burden incident to the discharge of any pledge made by Bunnell & Scranton must therefore be averaged among all the stocks and securities held in such pledge.

The claim of the plaintiff Hooker presents a somewhat different question. At the time of the assignment Bunnell & Scranton were carrying no stock or securities bought by them on his orders. He had, however, previously dealt through them upon margins, and was at the time, as the result of such dealings, indebted to them. As security for his margins he had from time to time deposited with them certain stocks of his own. At the time of the assignment these stocks were held by them as security for the balance due them. All of these stocks Bunnell & Scranton had hypothecated for their debts. A portion of them were hypothecated, with other stocks belonging to Bunnell & Scranton, and a small block of stock carried by Bunnell & Scranton for one of their customers. Hooker claims that he is entitled to have the stock thus pledged with his, first applied to the discharge of the pledge, before he shall be required to pay a greater amount than his indebtedness to Bunnell & Scranton to accomplish a redemption of his stocks. We think that this claim is well founded. We fail to discover in the record that Hooker ever gave Bunnell & Scranton any express authority to pledge his stocks, and we discover nothing from which an implied authority so to do can be in any way inferred. A pledgee, in the absence of authority, express or implied, is not permitted to re-pledge as security for his own debt. Upon the facts appearing in the record, therefore, Bunnell & Scranton's action in hypothecating Hooker's stocks must be regarded as wrongful. The stocks pledged with his were all rightfully pledged. They were either

stocks of the wrong-doers and debtors, or stocks of a customer who had authorized a re-pledging. The plaintiff's equity is therefore superior to that of the owners of the other stocks, and it is his right to have an application of their proceeds to the discharge of the pledge, before he shall be called upon to bear a burden imposed upon his property by the wrongful act of his bailee. *Willard* v. *White*, 56 Hun, 581.

The plaintiff Mrs. Trowbridge is administratrix upon the estate of Peggy Simpson, deceased. Among the assets of that estate were two bonds registered in the deceased's name. Shortly before Bunnell & Scranton's assignment she left these bonds with them as brokers to be sold. Accompanying the bonds was a power of transfer signed by her as administratrix. Bunnell & Scranton forwarded the bonds to their New York agents, who sold them and received the proceeds. Before Mrs. Trowbridge received the money Bunnell & Scranton assigned.

The proceeds of this sale were so impressed with the trust under which the bonds were held by Mrs. Trowbridge, and are so clearly traced by her into the hands of the trustee who now has them, that she is entitled to recover them. *In re Strachan*, L. R., 4 Ch. Div., 123 ; *Knatchbull* v. *Hallett*, 13 id., 713 ; *National Bank* v. *Life Ins. Co.*, 104 U. S. R., 54 ; *Farmers & Mechanics Bank* v. *King*, 57 Penn. St., 202 ; *Kip* v. *Bank of N. York.*, 10 Johns., 63 ; *People* v. *City Bank*, 96 N. York, 32 ; *Peak* v. *Ellicott*, 30 Kans., 156 ; *Englar* v. *Offult*, 70 Md., 78. Beach's Modern Equity, §§ 283–286.

The Superior Court is advised to render judgment for the plaintiffs, in accordance with the principles herein laid down.

In this opinion ANDREWS, C. J., and FENN, J., concurred.

TORRANCE, J. I agree with the majority of the court in holding, as follows :

1st. That the contract in question when carried out according to its terms and as contemplated by the parties resulted in the relation of pledgeor and pledgee between Bunnell &

Scranton and the plaintiffs, as to all stock purchased for the plaintiffs under and according to the contract.

2d. That upon the facts found by the committee any original stock in fact so purchased for any customer might be repledged by Bunnell & Scranton for their own debt.

3d. That upon such facts also such original stock might be sold or otherwise finally disposed of by Bunnell & Scranton for their own purposes at any time, provided that at or before such sale or final disposition they actually and in fact substituted for such original stock an equal number of shares of the same kind of stock.

4th. That a like disposition might be made by Bunnell & Scranton of any such substituted stock upon a like substitution at or before such disposition, and so on *ad infinitum.*

5th. That such stock actually substituted by Bunnell & Scranton for the stock so disposed of, immediately on such substitution and sale being made, became the property of the customer, subject to the pledge.

6th. That in all instances where any of the plaintiffs can show that either the original stock purchased for them according to the contract, or that which was substituted for it in the aforesaid manner, was in the possession of Bunnell & Scranton or their agents or pledgees at the time of the assignment, such plaintiffs are entitled to redeem their property.

To this extent I agree with the majority opinion. With what that opinion seems to me to hold expressly or by implication upon certain other points I do not agree.

In the first place, it seems to hold that the broker may at any time sell the original stock purchased for a customer, without first actually substituting in place of it other like stock, and may afterwards, at any time before the termination of the contract, substitute after-acquired stock with equal effect for all concerned.

This seems to me to be inconsistent with the legal conception of a pledge. In cases where, prior to the sale of such pledged stock, other stock is in fact substituted, the parties may be regarded, upon such a state of facts as is found by

the committee, as consenting to such sale and substitution, and thus in effect giving and receiving the substituted stock in pledge. But where no such substitution is made in fact the case is entirely different.

In such a case it can hardly be supposed that the customer has consented to let his stock be sold and take his chances of having other stock substituted for it at some indefinite time in the future at the caprice of the broker. A sale made without first substituting other stock is a wrongful conversion and ought to be so held.

In the next place, suppose a broker, without in fact substituting other stock therefor, sells the original stock purchased and being carried for a customer, at a time either when the broker himself owns stock of the same kind, or has none, but subsequently to the sale acquires it. The opinion seems to hold that, in such cases the lien of pledge in favor of the customer attaches to the stock then owned by the broker, or which he may subsequently acquire, without any act of substitution, and without any intent to substitute on his part.

It seems to me that in all cases of sale of the original stock by the broker for his own purposes, some unequivocal act of the broker manifesting and carrying out an intent to substitute other stock in place of that sold should be required, and where this cannot be shown to have been done before such sale, no lien of pledge in favor of the customer attaches to the stock of the broker then on hand, and certainly not to any which he subsequently acquires.

Lastly, the opinion seems to hold that, under the circumstances disclosed by the record, when the New York brokers purchased the stocks for Bunnell & Scranton which were in the possession of the New York brokers at the time of the assignment, such stock upon its purchase by the New York brokers became the property of the customers, pledged to Bunnell & Scranton, and by them sub-pledged to the New York brokers. This it seems to me is not so. When purchased by the New York brokers it was the property of Bunnell & Scranton, bought for them as their own by their own

agents and not for the customer through any agent of his. The New York brokers and the customer were strangers.

Undoubtedly Bunnell & Scranton bought the stock in order to fill the customer's order eventually, and would not have purchased but for that order; but I think the stock so purchased from first to last was the stock of Bunnell & Scranton alone, until they by some act set it aside and appropriated it to some customer. I agree, however, that the act of Bunnell & Scranton in crediting the customer with a certain number of shares of a given stock may be regarded as such an act. This was done, however, only on the purchase of the original stock and not on the purchase of most of the stocks which the plaintiffs now claim. If at the time of the assignment the New York brokers were carrying certain stocks for Bunnell and Scranton which the latter had not thus actually set apart or appropriated to their customers, then I hold that the customers had no property in such stocks. I do not think the facts found warrant the conclusion that any such substitution was in fact made in the case of most of the stocks now claimed by the plaintiffs.

The mere fact that a broker, at and after a sale of the original stock purchased for a customer, has and at all times retains in his possession or within his control sufficient stock of the kind sold to fill his customer's order at any time, and that he owned or controlled it in order to be ready to fill such order, will not of itself give the customer any property in such stock so held or controlled.

The majority opinion divides the plaintiffs into five classes with reference to their power or ability to identify their property. Classes one and two are I think entitled to redeem the property pledged. In those cases it is of necessity shown that the stock is either that which was originally purchased for the customer or that which had been in fact lawfully substituted for it. In regard to the other three classes, I think they are not entitled to redeem because the existence of a pledge is not shown.

I have thus briefly indicated, without arguing at length,

the points wherein I dissent from the opinion of the majority of the court.

CARPENTER, J., dissenting.   From August 14th, 1890, to November 24th of the same year, the plaintiff Paul C. Skiff ordered Bunnell & Scranton to purchase for him 500 shares of the stock of the Western Union Telegraph Company. The last of these orders was as follows :—

"New Haven, Conn., November 24, 1890.   Banking House of Bunnell & Scranton.   Please buy for my account and risk one hundred shares of the stock of the Western Union Telegraph Company; order good until countermanded.   It is agreed that Bunnell & Scranton have the right to dispose of, without notice, all stocks, bonds, petroleum and grain purchased or sold on margin, whenever said margin is reduced to two per cent.                       PAUL C. SKIFF."

It is conceded that the other orders given by this plaintiff and the other plaintiffs were in the same form, being printed blanks, filled out with dates and amounts, and signed by the respective parties.

These instruments are to be interpreted in the light of the usual course of business in this state, and in the state of New York, especially in the New York Stock Exchange.   The actual transactions under orders so given varied somewhat, but the order is so worded as to be equally applicable to whichever of the two more usual forms the transaction might assume,—a purchase of stock by the customer in his own name as an investment, or "a dealing in margins."   These two transactions are described in the finding as follows :—

"If the customer desired the delivery of the certificate or other proper evidence of title to the property ordered to be purchased, such certificate or evidence of title of such security or property was obtained by the firm and delivered to him upon payment to them of the purchase price and commissions.   If the transaction was to be upon margin, then the customer giving such order was required to place and keep with the firm cash or securities equal to a stipulated per cent of the par value of the securities or property ordered

by such customer to be bought, which deposit was called a margin. When stocks were ordered to be purchased upon margin, the certificate or other evidence of title of the prop-, erty thus ordered to be purchased was not delivered to the customer, but was held and made use of as hereinafter set out. It was understood between the customer and Bunnell & Scranton that the certificates of the property should not be delivered to the customer until the price thereof, with interest thereon and commissions, was paid. It was also understood that Bunnell & Scranton might, under 'certain circumstances, sell the securities thus carried to protect themselves from loss. Subject to such right it was agreed that the brokers would carry the property for the customer, at the risk of such customer, and that they would sell the same forthwith, upon the order of the customer, and account to him for the proceeds ; or, upon payment in full of the purchase price of the property, and all sums due for interest and commissions, that they would deliver to the customer a certificate or other proper evidence of title to the property. This is the usual agreement between brokers and their customers when stock is dealt in upon a margin."

We all agree that the plaintiffs, with possibly one or two exceptions, were dealers in stocks upon margins, as distinguished from purchasers of stocks as investments; in other words, were stock speculators. It is also agreed that whatever the plaintiffs recover will be paid from the assets of the insolvent firm before a dividend is paid to the creditors generally ; and that, to that extent, they will be made preferred creditors. This is contrary to the statute, and can only be justified upon the theory that the plaintiffs own the stocks in which they dealt, and which were in the hands of New York brokers, and controlled by Bunnell & Scranton at the time of the assignment. All these stocks were then subject to liens in favor of the brokers holding them, Prince & Whitely, and W. S. Lawson & Co., which liens must first be paid, leaving but a small margin for the plaintiffs.

If the plaintiffs were not the general owners of these stocks they could not be pledgeors ; if they were not pledgeors there

were no pledges; and if there were no pledges the plaintiffs have no case. That must be conceded.

I now propose to show that the relation of pledgeor and pledgee did not exist between these parties. I will speak only of Skiff's case, as his is a fair sample of all the others.

When and how did he acquire a title? Certainly not by his contract; for it is conceded that by the custom of the business, in view of which the contract was made, and which thereby became a part of it, he could have no title to the stock until he paid the purchase price in full; and that payment has never been made. Only a small margin was paid to the brokers to protect them from loss, and they, at the time of the assignment, held the general title, legal and equitable. Their dominion over it was absolute except as they were bound to sell when directed by Skiff, and they might sell under certain conditions without his direction. All that Skiff owned was a right to pay the purchase money, and then, and not before, to have the title vested in himself. A right to acquire a title is not *per se* a title. A right to purchase a thing *in futuro* is not a purchase *in præsenti.* These principles are elementary, and will not be denied. As they are undeniable, and applicable to the case, they demonstrate the non-existence of a pledge.

But I propose to pursue this subject a little further. What necessity is there for a pledge? The parties were capable of contracting for themselves, and they did contract for themselves. Bunnell & Scranton stipulated for such security as they desired; a security which gave them not only the possessory title, but the legal and equitable title as well. Why not leave the parties where they left themselves? Why not enforce the contract which they made, instead of imputing to them a contract which they did not make, and attempting to enforce that? Why substitute for the *executory* contract, which the parties in fact made, an *executed* contract which they did not make? Or, if that is stating it too strongly, why treat a contract which is executed only in part, and remains partly executory, as though it was completely executed?

I am aware that the courts of New York have taken that view of similar transactions. Following those cases, certain text writers have taken the same view. Massachusetts, on the other hand, repudiates the fiction that the customer becomes a pledgeor, and the broker a pledgee. The question has not heretofore been decided in this state, and, until the announcement of this decision, we were at liberty to decide it upon principle.

The leading case in New York which seems to be the foundation of all the other cases, is *Markham* v. *Jaudon*, 41 N. York, 235. The reasoning of the court is as follows: "The plaintiff calls upon the defendants, who are brokers, to purchase for him certain shares of railroad stock, and furnishes him with $1000 for that purpose, agreeing to pay interest on the advances he shall make in the purchase, and commissions. The defendants make the purchase, having themselves advanced ninety per cent of the purchase money. They bring to the plaintiff the certificates of the stock thus purchased by him and for him, and deliver them to him as the owner thereof. He thereupon hands them back to the defendants, to hold as security for their advance on the purchase with interest and commissions. If these precise forms had been observed, no one would deny that the re-delivery of the certificates would have constituted a strict formal pledge. In my opinion the transaction, as it took place, amounted to the same thing. To have delivered the certificates to the plaintiff, and that the plaintiff should then have returned them to the defendants, to be held by them as security for advances in their purchases, would leave the parties in precisely the same situation as if the defendants had retained them for that purpose; the form of a delivery to the plaintiff, and a re-delivery by him to the defendants, being waived by agreement of the parties."

There is one significant thing noticeable in this reasoning. There is a distinct recognition of the necessity of a title in the purchaser; that is, that a title in him is essential to a pledge by him. And that need is supplied by a supposed delivery of the certificates of title to him by the brokers; and

that recognition is immediately followed by a declaration that the delivery was immaterial; that after the delivery and re-delivery of the certificates of title the parties were left "in precisely the same situation as if the defendants had retained them for that purpose." And this reasoning seems to lie at the foundation of the subsequent cases. It does not bear examination. Prior to the supposed delivery the customer had no title, and the delivery was for the very purpose of clothing him with one. It did that, and much more. It converted an executory contract into an executed one—an option to buy into a sale, and the purchase price, which the customer was at liberty to pay and take the stock or not, as he pleased, into an absolute debt. It not only wrought an entire change in the relation of the parties to the purchase money and the thing purchased, but also in the nature of the security. That was changed from a clear title with an almost absolute dominion over it, into a possessory title with a limited right to sell. I do not say that the security was impaired, but it certainly was not improved. It will not do to say that the observance of such forms is a mere formality, a mere idle ceremony. It was not a matter of form, but a matter of substance.

I do not mean to criticise the decision; but I do say that the reasoning by which it is attempted to sustain it does not commend itself to my judgment as being sound. I think the decision would have been better sustained by calling the transaction, what it was in fact, a contract to deliver stock on receiving the purchase money. Characterizing it as a pledge is a misnomer, and is misleading. It is like reasoning from false premises, which can hardly fail to lead astray.

If the view I have taken of this case is the correct one it should be decisive against the plaintiffs. But if not, then there are other considerations that should be noticed.

I have thus far assumed that Bunnell & Scranton in fact purchased the stocks ordered by the several plaintiffs. But they did not. The finding shows that substantially all the plaintiffs' orders were executed by Prince & Whitely, or by W. S. Lawson & Co., upon the order of Bunnell & Scranton.

Neither of these firms had any business relations with any of the plaintiffs, all their transactions being with Bunnell & Scranton. Most if not all the stocks controlled by Bunnell & Scranton at the time of their failure, were in the hands of one or the other of these two firms. If I understand the scope of the decision it holds that each plaintiff sustains the relation of pledgeor to the stock ordered by him and purchased either by Prince & Whitely or by Lawson & Co., those brokers being the pledgees. But how or when that relation came into existence I must confess my inability to understand. It certainly arose from no contract, express or implied, between the parties, for they are strangers to each other.

Skiff ordered Bunnell & Scranton to purchase on his account 100 shares of Western Union. Bunnell & Scranton ordered Prince & Whitely to purchase the stock for them in their own name. They did so. Bunnell & Scranton thereupon notified Skiff that they had executed his order. Now I can understand that Bunnell & Scranton have a claim on Prince & Whitely, for that amount of that kind of stock, whether by virtue of the express contract or a constructive pledge is immaterial, and that Skiff has a claim on Bunnell & Scranton for the stock he ordered: but how Skiff can have any direct claim on Prince & Whitely, or can be regarded as the owner of the stock which they purchased in their own names on account of Bunnell & Scranton, is beyond my comprehension. The bare statement of the proposition seems to me to demonstrate its absurdity. If it is proper for the court to assume that Prince & Whitely delivered the stock to Bunnell & Scranton, and thereupon took a redelivery of it in pledge, will the court make the further assumption that Bunnell & Scranton delivered it to Skiff, and that Skiff directly or indirectly pledged it to Prince & Whitely? Clearly it is only by some such process that the relation of pledgeor and pledgee can be established between Skiff and Prince & Whitely. Will it be said that Bunnell & Scranton are the pledgeors, and that Skiff, by virtue of his contract with them, has an equitable claim on the pledge? But that severs the

connection between Skiff and the pledge, and relegates him to the simple relation of a contractor with Bunnell & Scranton. Prior to the assignment Bunnell & Scranton had a right to redeem the pledge and avail themselves of the value of the equity. But Skiff had no lien on that. Why not, if he had any claim to the pledge before? By the assignment the equity became assets in the hands of the assignee. What is there to distinguish that from other assets, and give notice to creditors and others interested of Skiff's claim? Courts will not undertake to protect and enforce such vague and shadowy claims, especially where they are secret and not likely to be known by those who have a right to know of them.

Take another illustration. From August 14th to November 24th, 1890, Paul C. Skiff ordered Bunnell & Scranton to purchase on his account 500 shares of Western Union, which were purchased by Prince & Whitely. At the time of the assignment Bunnell & Scranton were carrying for Skiff 500 shares of that stock, and 50 shares for one Merrill. At that time Prince & Whitely were carrying 50 shares of the stock only for Bunnell & Scranton, and Lawson & Co. were carrying for them 350 shares. Bunnell & Scranton also had 100 shares of the same stock, which were pledged to the New Haven Orphan Asylum. Thus they had 500 shares only, and their customers called for 550 shares. The finding does not show what disposition was made of the other fifty. By what rule can the court apportion the 500 shares between Skiff and Merrill? True, they have shrewdly agreed between themselves that they will take the stock and make the apportionment without troubling the court. But that does not remove the legal difficulty. Parties coming into court for relief in matters of this kind should be able not only to show definitely the nature and character of their title, but also to point out with reasonable certainty the precise thing to which they claim title. If neither the subject matter nor the title can be ascertained it tends strongly to show that they have no case.

Another thing is noticeable. Prince & Whitely purchased

all the stock ordered by Skiff. At the time of the failure they had 50 shares only, and Lawson & Co. had 350 shares.

Now assuming that Skiff was pledgeor of the stock purchased by Prince & Whitely, what has become of that pledge? The finding does not even show what has become of the stock; only that it is gone. There can be no presumption that that in the hands of Lawson & Co. is a part of it. Is there any difficulty in sustaining that pledge? In *Markham* v. *Jaudon* it was held that a sale of the thing pledged without notice to the pledgeor was a conversion for which the pledgee was liable in damages. It is not claimed that any notice of the sale was given to Skiff. That sale must have been either a conversion or an appropriation of the thing pledged. In either case the pledge, as such, is gone, and cannot now be enforced. Neither does the finding show under what circumstances or for whom the stock held by Lawson & Co. was purchased. Will it be claimed that a pledge by Skiff attached to that stock? If so, was it the former pledge transferred, or a new pledge created? And how was the transfer effected? or the new pledge created? Answers to these questions would be interesting. If Skiff has a pledgeor's claim to that stock, it is possible that the party for whom it was purchased has one also. How are these conflicting claims to be adjusted? It is unnecessary to pursue this subject further. For other complications which exist, and difficulties which will necessarily be encountered in applying the decision to the facts of the case, it is sufficient to refer to the majority opinion.

I again refer to the case of *Markham* v. *Jaudon*. As before stated, that was a case between the original parties. It was an action against the brokers whom the plaintiff had employed to purchase the stock, and who had actually purchased it, and had sold it without notice to the plaintiff. The action was not to redeem the supposed pledge, but to recover damages for a conversion of it. Of course the pledgee had violated his contract and the pledge had ceased to exist. There was no attempt to follow the stock. It was assumed that the claim was purely personal. It was held that the brokers were

liable. In reaching a conclusion the court not only likened the transaction to a pledge, but declared that the legal relation of the parties was that of pledgeor and pledgee. As I have before remarked, in that case it mattered not whether it was called a pledge or simply a contract. The liability and the extent of the liability were the same, and the immediate parties to the contract were alone affected. In this case other parties are or may be affected. Among these are the New York brokers who purchased the stock upon the order of Bunnell & Scranton, persons to whom any of the stock was sold or re-pledged, and all the creditors of Bunnell & Scranton. That case may be an authority in a suit between the customer and the broker to whom the order was given, and who actually purchased the stock, although for reasons hereinbefore given I do not think it expedient to follow it. Beyond those limits it is not an authority for the plaintiffs, but on the contrary it seems to be against them. It will be observed that inasmuch as the stock had passed into the hands of persons who were neither parties nor privies to the supposed contract of pledge, the theory was of no practical importance to the case ; indeed it was not in the case at all until brought in, unnecessarily as I think, in the reasoning of the court. Thus far, aside from the illustration in the reasoning, the real case, and the logic of its facts, were decidedly unfavorable to the plaintiffs. The strength of precedents lies in the facts of the case, and in the application of the law to the facts, rather than in the illustrations used in the arguments. Calling the transaction a pledge is in the nature of an *obiter dictum* in respect to a matter of fact and not of law; a *dictum*, unfortunately, which is not quite true in fact. Such *dicta* are entitled to but little weight.

There is another feature of that case which is worthy of notice. It is this. The court held that evidence that the sale of the stock which constituted the conversion was in harmony with the custom of brokers and was in the usual course of the business, was inadmissible on the ground that it was contrary to the well-settled rules of law. The rules of law referred to seem to be the law relating to pledges ; the principal one

of which is, that a pledgee may not sell the thing in pledge except upon a judicial sale, or upon giving notice to the pledgeor of the time and place of sale. It seems to me that the argument should have been turned around. Instead of holding that the rule of law relating to pledges was a sufficient reason for excluding evidence of a custom, the existence of the custom should have been regarded as a convincing reason why the transaction should not have been called a pledge. The argument is vastly stronger in that direction than in the other. This case however is not complicated with any question of evidence. The fact as to the existence of such a custom, and the further fact that it was followed by the supposed pledgees, are in the case, and they should have had their legitimate effect in completely destroying the pledge theory.

My view of the case is, that while *Markham* v. *Jaudon* and the cases which follow it, and also some text writers, may be authorities for holding that a broker purchasing stock, and the customer who ordered it, may sustain to each other the relation of pledgee and pledgeor, yet that it is so inconsistent with sound principle, and if followed to its logical results might be so disastrous in its consequences that it ought not to be followed, even to that extent. But, if followed to that extent, we ought to follow the principal case in the real point decided, that a sale or a sub-pledge is a conversion of the thing pledged, which destroys the pledge, so that the pledgeor's remedy is not a redemption but an action for damages.

But these authorities are not in point for any one of the following propositions:—

1. That these plaintiffs, or any one of them, are pledgeors to Prince & Whitely or W. S. Lawson & Co.

2. That a pledge to a broker who purchased the stock to secure him for advances made for the purchase, attaches to any property subsequently purchased.

3. That such a pledge attaches to any property purchased for the customer by other brokers.

4. That where there are several customers dealing with the same broker, buying the same kind of stock, and at the time of the failure he had not sufficient stock to answer the

demands of all the customers, the customers have a joint pledge or a pledge as tenants in common on whatever stock remains.

5. That when the identity of the stock. cannot be traced, still, if it can be shown that the broker actually received its value in money, the pledgeor may redeem the money by paying the charges against it, and take the balance.

' 6. That where money, stocks or other property have been consumed, destroyed, or so mingled with other property of the same kind as to be incapable of identification or recognition, still they are capable of sustaining a pledge.

It seems to me that the decision virtually affirms the soundness of all or most of these propositions. While, on the other hand, if the contract is simply construed according to its plain terms, and the manifest intention of the parties, as gathered from the custom of brokers and the acts of the parties, no such inferences are possible. When a contract is general in its terms, and somewhat indefinite as to its purpose, what the parties actually did under it, if not inconsistent with its terms, affords the most satisfactory indication of their real intention. If we apply that test we can have no doubt as to the real nature of the transaction. Bunnell & Scranton agreed to purchase on Skiff's account and risk 500 shares of the stock of the Western Union Telegraph Company, and Skiff agreed to furnish them with ten per cent of the par value of the stock. The brokers agreed to hold the stock at the pleasure of Skiff, provided Skiff paid the interest on their advances and their commissions, and also kept the margin good. Skiff promised to pay interest and commissions and to keep the margin good, and, if he failed to do so, he agreed that the brokers might sell the stock and thus protect themselves from loss. The brokers also agreed to sell the stock when directed by Skiff, or deliver to him the certificates upon his paying the balance of the purchase price with interest and commissions.

These agreements were performed on both sides, except that the brokers did not hold the stock, but disposed of it, intending to replace it with other stock of the same kind so

as to be able to sell or deliver it when requested. That was regarded as a substantial compliance with the terms of the agreement. Thus matters stood at the time of the failure. This interpretation meets fully all the requirements of the contract and the demands of the situation, and effectuates the real intention of the parties. That intention clearly was, not to buy stocks, but to speculate. Speculators should receive their just legal rights, and nothing more; especially should they receive no favors at the expense of innocent third parties.

· One illustration more. Suppose that Bunnell & Scranton and Skiff, at the commencement of their dealings, had agreed that Skiff should be the owner of all the stock purchased, either by Bunnell & Scranton or by other brokers upon their order and that that stock should be regarded as pledged to the broker purchasing it to secure his advances; that the pledge should follow that stock into whosesoever hands it should go so long as it could be traced; that if that stock should be disposed of and other stock of the same kind acquired in its place, the pledge should be deemed to be transferred to the newly acquired stock; that if at any time the stock held by the broker should be insufficient to meet the demands of all the customers, it should be deemed that there was a joint pledge by all, covering the stock held by the broker, and that each might redeem a proportional part of it; and in short, if the stock could not be traced, and the proceeds could, that the pledge, with a corresponding right of redemption, should be deemed to attach to the proceeds. Is this court prepared to sanction and enforce such a contract?

Objectionable as such an express contract would be, it is still more objectionable to impute such a contract to the parties by construction, and then enforce it.

In the case of Mrs. Trowbridge I agree with the majority.

The view I have taken of this case does not require that the case of *Ingraham* v. *Taylor*, 58 Conn., 503, should be overruled. I think that case interpreted the contract as it was understood by the parties. If in that respect this decision had followed that case, the two cases would not have been inconsistent.