SMITH, Appellant, vs. BECKER and others, Respondents.

*September 17—October 9, 1906.*

*Pledge of corporate stock: Sale through brokers: Evidence: Mingling of shares of pledgor with shares owned by pledgee: Assent of pledgor: Sale from common mass: Identification.*

1. The question being whether there had in fact been a sale of certain shares of corporate stock which had been pledged to a bank with authority to sell, evidence showing, among other things, that the bank sent the shares to brokers with instructions to sell; that the brokers afterwards reported sales of the stock and accounted therefor to the bank at the market prices; and that the pledgor was credited with the proceeds of such sales and notified thereof, with dates and prices, to all of which he assented, is *held* sufficient to sustain a finding that there had been a valid sale under the contract of pledge, notwithstanding evidence that, in accordance with the custom of doing business on the stock exchange, the shares, after being received by the brokers, were transferred to clerks and at once indorsed by them and returned to the brokers and, even after the reported sales, remained on the books of the corporation in the names of said clerks, who in fact had no interest in

them, and that at some subsequent time—within seven years—
the shares were transferred by the brokers to the president of
the bank,—there being no proof that the latter had purchased
at the sales made by the brokers for the bank.

2. Assuming the existence of an agreement by a bank to keep sep-
arate the stock of each of three pledgors, each of whom was
liable for the whole debt secured, the evidence is *held* to show
that such pledgors subsequently assented to the mingling of the
stock at the time of an exchange thereof for stock in a suc-
cessor corporation.

3. The fact that a bank sold shares of stock from a certificate which
included shares pledged to the bank and shares belonging to it
absolutely does not show that it sold its own shares, where it
appears that it had authority to sell the pledged stock without
notice, that the indebtedness secured thereby was past due, and
that the proceeds of the sales were credited to the pledgor, who
was notified of the sales and credits and made no objection at
the time.

APPEAL from a judgment of the circuit court for Milwau-
kee county: WARREN D. TARRANT, Circuit Judge. *Affirmed.*

This action was originally brought against the defendant
*Washington Becker* and the Wisconsin Marine & Fire Insur-
ance Company Bank to redeem certain securities which said
bank held as collateral for the indebtedness of the plaintiff,
and for discovery and accounting for the proceeds of such
securities, and the setting aside of a settlement between the
defendant bank and plaintiff. The action was commenced
October 4, 1902, and the other defendants were afterwards
brought in. The charter of the Wisconsin Marine & Fire In-
surance Company Bank expired in July, 1900. The defend-
ant *Marine National Bank* acquired, substantially, the bank
assets of the Wisconsin Marine & Fire Insurance Company
Bank. The defendant *Oldmar Investment Company* was or-
ganized to take a part of the assets of the Wisconsin Marine
& Fire Insurance Company Bank. The defendants *Ethelinda
T. Johnston* and *Harriet D. Mitchell* are the representatives
of John Johnston and John L. Mitchell, deceased, stockhold-
ers in the former Wisconsin Marine & Fire Insurance Com-
pany Bank.

The stock involved in this case is 1,542 shares of the capital stock of the Western Gas Company.        In June, 1892, Frank W. Montgomery obtained from John L. Mitchell an option to purchase 3,781 shares of the capital stock of the Milwaukee Gas Light Company.        Benjamin Weil and the plaintiff became interested with Montgomery in the transaction, and negotiations were made by Montgomery, Weil, and *Smith* with John Johnston and David Ferguson, then officers of the Wisconsin Marine & Fire Insurance Company Bank, by which said bank agreed to loan Weil, Montgomery, and *Smith* $378,100 on joint note, secured by Milwaukee Gas Light Company stock.        The only investment made by Weil, Montgomery, and *Smith* in addition to this borrowed money was $100 paid by Montgomery to Mitchell to secure the option.        At the time of this loan Montgomery, Weil, and *Smith* agreed to give Johnston and Ferguson each 500 shares of stock of the Western Gas Company, which was to be organized out of the Milwaukee Gas Light Company.        This stock was known as bonus stock.        At the time of the loan Montgomery acquired fifty-five additional shares of the stock of the Milwaukee Gas Light Company, which together with 3,781 shares in the name of Mitchell were returned to the company and a new certificate, No. 2,319, for 3,836 shares was issued to Frank W. Montgomery, and by him deposited with the bank as collateral security for the loan.        Afterwards and in September, 1892, Montgomery assigned to Weil 1,260 shares and to plaintiff 1,260 shares by indorsement on certificate No. 2,319 for 3,836 shares, and Milwaukee Gas Light Company stock certificate No. 2,322 for 1,260 shares was issued to Weil, and by him indorsed in blank, and certificate No. 2,323 for 1,260 shares issued to plaintiff, and by him indorsed in blank, and certificate No. 2,324 for 1,261 shares issued to Montgomery, and by him indorsed in blank, and these three certificates deposited as collateral for the joint note given for $378,100.

On December 31, 1892, the joint note for $378,100 was taken up and Montgomery, Weil, and *Smith* each made his separate note; Weil's and *Smith's* for $126,000 each, and Montgomery's for $126,100, and the note of each indorsed by the other parties. The stock of the Milwaukee Gas Light Company continued as collateral to these notes. *Smith's* note contained power of sale similar to other powers given by him subsequently. This note matured September 15, 1893. Pursuant to the original plan the Western Gas Company was organized, which purchased all the stock of the Milwaukee Gas Light Company, and issued its own stock and bonds in exchange therefor at the rate of $125 in bonds and $125 in stock of the Western Gas Company for each $100 of stock of the Milwaukee Gas Light Company. The exchange of the Weil, *Smith,* and Montgomery stock, as well as some other stock, was effected through subscription made by Montgomery. In pursuance of Montgomery's subscription and the surrender of this Milwaukee Gas Light Company stock there was issued to Montgomery certificate of the Western Gas Company No. A-010 for 6,110 shares, dated June 1, 1893, and Montgomery assigned these 6,110 shares to the various persons entitled thereto, and the Western Gas Company stock which represented the 3,781 shares of Milwaukee Gas Light Company stock given by Montgomery, Weil, and *Smith* as collateral was represented by three assignments to defendant *Washington Becker* for the respective amounts of 1,577, 1,575, and 1,628 shares. Under the reorganization Weil was to receive stock to the par value of $126,142, *Smith* $120,766, Montgomery $120,892 (the greater amount going to Weil on account of his forty-three additional shares of Milwaukee Gas Light Company stock), D. Ferguson was to have $50,000, John Johnston $50,000, and J. P. Murphy $10,200. The bonus stock, under the arrangement, was not to be delivered until the bank had been paid; therefore the entire 4,780 shares were turned over to the bank as security, and for convenience

were placed in the name of *Washington Becker,* who was assisting the bank. On the transfer by Montgomery as collateral there were issued to *Washington Becker* three certificates of stock by the Western Gas Company, dated June 15, 1893, as follows: Certificate No. A–185 for 1,575 shares of $100 each, certificate No. A–186 for 1,628 shares, and certificate No. A–187 for 1,577 shares, which certificates represented respectively the *Smith,* Weil, and Montgomery stock, including the bonus stock and the Murphy stock. Under the arrangement thus carried out the 1,575 shares of plaintiff of the Western Gas Company stock were held in the name of defendant *Becker* with power of sale to the bank, and subject to the agreement on *Smith's* part to give his proportionate one-third of the 500 shares each to Ferguson and Johnston, and of the 100 shares to Murphy, when the bank should have been paid.

In February, 1894, Weil paid the bank his note for $126,000, and certificate No. A–186 for 1,628 shares was surrendered and a new certificate for 1,303 shares, No. A–363, issued to Weil, and a further certificate, No. A–364 for 325 shares, was issued to defendant *Washington Becker.* These 325 shares represented all but eight shares of Weil's one-third of the bonus stock, the remaining eight shares having been delivered by Weil to Vermilye & Co., New York brokers. March 3, 1893, Montgomery made a settlement with the bank and his note for $126,100 was returned. In July, 1893, the Wisconsin Marine & Fire Insurance Company Bank was placed in the hands of *Washington Becker* as receiver, and was afterwards reorganized and resumed business in 1894, with *Becker* as president and John Johnston as cashier, under name of *Marine National Bank,* defendant. In 1894 some changes were made in the form of these certificates—certificate No. A–491 for 3,477 shares was surrendered, and three certificates were issued in its place, No. A–503 for 500 shares in the name of John Johnston,

No. A–504 for 500 shares in the name of Wisconsin Marine & Fire Insurance Company Bank, and No. A–506 for 2,477 shares also in the name of Wisconsin Marine & Fire Insurance Company Bank. In October, 1894, the bank sent the certificates indorsed in blank to Vermilye & Co., bankers and brokers in New York, to be held subject to the order of the bank. In December, 1894, the bank caused 500 shares of stock to be sold on account of Montgomery, and on these sales delivery was made from certificate No. A–503 in the name of John Johnston. On April 27, 1895, the bank made a settlement with Montgomery, and surrendered his note and some American Realty Company bonds, and a life insurance policy, and gave him a receipt in full, the bank taking from him a bill of sale of 761 shares of the Western Gas Company stock and the $82,500 bonds.

On April 27, 1895, the bank held 2,985 shares of stock, which included the plaintiff's stock held by the bank as collateral security to his note, which note authorized "said bank, or its president, or its cashier, or its assign or assigns, to sell said bonds and stock at any time hereafter at public or private sale without advertising the same or demanding payment or giving notice of such sale, and it may become the purchaser on such sale and apply the net proceeds to the payment of all or either one of the notes above described, and in such order and manner as it shall deem best." Vermilye & Co., New York bankers and brokers, to whom this stock was sent subject to the order of the bank, by instructions of said bank undertook to sell it, and reported sales at different times between the 27th day of April and the 20th day of June, 1895, aggregating 1,542 shares. On April 27, 1895, Vermilye & Co. held for the bank 2,985 shares in three certificates, one for 2,477 shares, one for 500 shares, and one for eight shares received from Weil in December, 1894.

After the reported sales by Vermilye & Co. and on or about the 24th day of June, 1895, the plaintiff made a final settle-

ment with the bank through defendant *Washington Becker,* its representative, and at this time the whole matter was gone into respecting the reported sales. ·It is claimed that 700 shares of the stock held by the bank as collateral on reported sales of Vermilye & Co. were not sold, but held by Vermilye & Co. and at some time prior to May 29, 1902, transferred to defendant *Washington Becker,* who was not an innocent purchaser, and by him exchanged for American Light & Traction Co. stock, which he still holds. It is also claimed by plaintiff that 842 shares belonging to *Smith* were not sold, but were transferred by the Wisconsin Marine & Fire Insurance Company Bank to defendant *Marine National Bank* at the time of its organization, *Washington Becker* being president and John Johnston vice-president; while, on the other hand, it is contended on the part of the defendants that the bank sold the stock of the plaintiff through Vermilye & Co. under the power of sale given, and that such sale was valid. The defendants also set up as a bar to plaintiff's action the settlement made June 24, 1895; also that the statute of limitations had run against plaintiff's claim, and further that he is barred by his laches.

The court below held that the sale by the pledgee of the collateral was valid under the contract of pledge, and further found that the cause of action set up in the complaint was barred by the statute of limitations, and that the plaintiff was guilty of laches, and ordered the complaint dismissed with costs, from which judgment this appeal was taken.

For the appellant there were briefs by *Miller, Mack & Fairchild,* and oral argument by *George P. Miller.* They contended, *inter alia,* that the retention of the 700 shares by Vermilye & Co., agents for sale, under the pretense that they had made sale of the shares, did not effect any sale of the shares. *Wilson v. Carpenter,* 17 Wis. 512, 516; *Anderson v. Crisp,* 5 Wash. 178, 18 L. R. A. 419; 1 Dos Passos, Stock Brokers (2d ed.) 213, 214, 382, 383; *Rosenstock v. Tormey,*

32 Md. 169, 183; *Maryland F. Ins. Co. v. Dalrymple,* 25
Md. 242, 267; *First Nat. Bank v. Rush,* 85 Fed. 539, 544;
*Glidden v. Mechanics' Nat. Bank,* 53 Ohio St. 588; *Sharpe
v. Nat. Bank,* 87 Ala. 644, 649; *Leahy v. Lobdell,* 80 Fed.
665, 670; *Bryson v. Rayner,* 25 Md. 424; *Middlesex Bank
v. Minot,* 4 Met. 325; *Bank of Old Dominion v. D. & P. R.
Co.* 8 Iowa, 277; *Norton v. Baxter,* 41 Minn. 146; *Appleton
v. Turnbull,* 84 Me. 72; *Minneapolis Asso. v. Canfield,* 121
U. S. 295, 298; *Bryan v. Baldwin,* 52 N. Y. 232; *First Nat.
Bank v. Hall,* 22 App. Div. 356; *Terry v. Birmingham Nat.
Bank,* 93 Ala. 599; *Taussig v. Hart,* 49 N. Y. 301; *Petti-
bone v. Perkins,* 6 Wis. 616; *Kellogg v. Malick,* 125 Wis.
239, 252; Jones, Pledges, § 637; 3 Clark & M. Priv. Corp.
§ 622*b,* p. 1889.    There is no evidence that *Washington
Becker* was an innocent purchaser for value of these 700
shares. The presumption is that property dealt with in breach
of a trust or other fiduciary relation is acquired by a subse-
quent purchaser with notice. 1 Bigelow, Fraud, 131, 135;
*Sylvester v. Guernsey,* 22 Wis. 569, 572; *Weeks v. M., L. S.
& W. R. Co.* 78 Wis. 501, 525. As to the 842 shares, when
the bank sold them from the common mass which included
shares owned by the bank itself as well as shares held by it
as collateral security, it became the conclusive presumption
of law that the bank had sold its own stock.    The result of
the bank's mixing these shares of plaintiff's with shares which
afterwards became the property of the bank was that, if it
wished to sell plaintiff's shares, it was obligated to identify
the shares sold as plaintiff's at the moment of sale by some
unequivocal act.    *Nonotuck Silk Co. v. Flanders,* 87 Wis.
237, 241; *Skiff v. Stoddard,* 63 Conn. 198, 227; *Pinkett v.
Wright,* 2 Hare, 120, 128 *et seq.; Newton v. Howe,* 29 Wis.
531, 535; *Haas v. Ruston,* 14 Ind. App. 8, 42 N. E. 298;
1 Dos Passos, Stock Brokers (2d ed.) 213, 214. To constitute
a valid exercise of the bank's power of sale, the act must show
that it was done in pursuance of the power.    2 Perry, Trusts

(5th ed.) § 511c; *Roake v. Denn,* 4 Bligh, N. s. 1; *Blagge v. Miles,* 1 Story, 426; *Lee v. Simpson,* 134 U. S. 572, 589; *Towle v. Ewing,* 23 Wis. 336; *Lardner v. Williams,* 98 Wis. 514; *Mines v. Gambrill,* 71 Md. 30, 18 Atl. 43; *Patterson v. Wilson,* 64 Md. 193, 1 Atl. 68; *Brown v. Phillips,* 16 R. I. 612, 18 Atl. 249.

For the respondents there was a brief by *Turner, Hunter, Pease & Turner,* attorneys, and *W. H. Timlin,* of counsel, and oral argument by *Mr. Timlin* and *Mr. W. J. Turner.*

KERWIN, J. The first proposition discussed by appellant is that there was no sale of any of the stock of the plaintiff, but simply a pretense of sale. The court below found there was a sale, and the question presented under this head is whether there is sufficient evidence to support the finding. This branch of counsel's argument is classified under two heads: (1) That Vermilye & Co., who were agents for the sale of the stock, retained 700 shares thereof, representing it as sold, and at some date, not ascertained, transferred it to defendant *Becker.* (2) That as the 842 shares were a part of an indistinguishable mass of stock held by the bank, included in which were shares belonging to the bank itself, when the bank made a sale without any designation as to which stocks were sold, as a matter of law this effected a sale of the bank's own stock, and the representation made a few days later that the plaintiff's stock was sold cannot affect the situation.

1. The argument as to the 700 shares is that they were transferred to the clerks of Vermilye & Co. and immediately indorsed by such clerks and returned to Vermilye & Co., and that the clerks had no interest in them, but that they remained the property of Vermilye & Co., and stood on the books in the names of such clerks, and were afterwards transferred by Vermilye & Co. to defendant *Becker.* Vermilye & Co. had two certificates of stock from the bank for sale—one

No. A–504 for 500 shares, and one No. A–506 for 2,477 shares. The 500 shares were on April 27, 1895, transferred to L. A. Miller, a clerk of Vermilye & Co., who indorsed and returned them to Vermilye & Co. The 2,477 shares were with the approval of the bank transferred by Vermilye & Co. into twenty-five certificates in the names of their clerks, and two of these certificates for 100 shares remained in the names of the clerks of Vermilye & Co. So, it is claimed that these 700 shares remained unsold in Vermilye & Co.'s hands. Vermilye & Co. reported, in obedience to telegrams to sell, the sale of the 700 shares remaining in the names of their clerks, and were debited for the proceeds of such sales in connection with 842 shares sold between April 27 and June 20, 1895. On the transfer of the 500 shares to L. A. Miller, certificate No. A–504 was surrendered and certificate No. A–727 for the same amount issued to L. A. Miller. The 500 shares and the 200 shares transferred to Vermilye & Co.'s clerks were accounted for at market prices on the dates sales were reported as made. No transfer on the books of the Western Gas Company of these 700 shares was made, but on report of sales from Vermilye & Co. the bank charged the amount to Vermilye & Co. and credited the amount upon the plaintiff's indebtedness, to which the 700 shares of stock were collateral. While some point is made by appellant as to the stock being sold or reported sold upon a rising market, we are unable to find from the evidence, which is voluminous, that any of the sales were made below the market price on the days sales were reported as made. But the adequacy of price is not questioned; the point is: Was there a sale of the 700 shares? The point of contention is that, because the 700 shares remained in the names of the clerks of Vermilye & Co. and such clerks appearing to have no interest in the 'stock, there was no sale. But upon the record we think this conclusion does not follow. It appears from the evidence that it was the custom on the stock exchange in New York to make sales in the manner

shown by the proof in this case. It also appears that it was customary to split up certificates into small lots and indorse them in the way these were indorsed, in order to put them upon the market to advantage. The testimony is that, in dealing in stock on the New York exchange, the stock must be indorsed, before it is good delivery, by some member of the stock exchange or by some one having a membership; then it passes as a good delivery from house to house. The reasons for such indorsement are given in the evidence. After such indorsement the certificate passes current. The evidence is that buying and selling is done in the names of brokers or their clerks, although in the meantime the stock is passing from one owner to another, and finally returns to some client of the first broker, in whose name, or in the name of whose clerk, it is. The custom is for brokers to deal in their own name and not disclose their principal. This appears to be the custom in New York on the curb and in the stock exchange, and there is nothing in the evidence tending to show that the course pursued by the brokers, Vermilye & Co., raised any presumption that they did not sell the stock in the usual manner and according to the custom of brokers. 23 Am. & Eng. Ency. of Law (1st ed.) 725, 726, 775. The evidence does not show that there was any continuous ownership of these 700 shares in one person from the time of sale, April 27, 1895, until the time defendant *Becker* got the stock in 1902, but shows that the certificates were current on the market, duly indorsed, and sales of them reported to the bank by Vermilye & Co. according to the custom of doing business on the stock exchange, and the proceeds of each sale placed to the credit of the bank by Vermilye & Co. The court below found

"that for each and every one of said sales said Wisconsin Marine & Fire Insurance Company Bank received cash at the time of said sale to the amount of the proceeds of said sale, and such sale was so consummated by payment in full to the said bank, and by the broker, or broker's clerk, in whose name

the certificate stood, delivering the same to the purchaser either by an actual manual delivery then and there, or by his becoming, by agreement and understanding with the purchaser, from thenceforth the bailee of the purchaser. And the court further finds that such mode of sale was in contemplation of the parties to said contract of pledge, who were familiar with transactions in that kind of property, and was the best and most advantageous method of disposing of this particular property."

In view of this proof of custom and the transactions between the brokers, Vermilye & Co., a reputable firm, and the bank, it cannot be said that the brokers were guilty of a breach of their engagement with the bank in violating the trust reposed in them. The court below was, at least, warranted in drawing such inference. The fact that the 700 shares remained upon the books of the Western Gas Company, while under some circumstances it might tend to prove title, is not sufficient to overcome the inferences of sale which may legitimately be drawn from the whole evidence produced. There is no proof whatever that defendant *Becker* purchased at the sale by the bank through its brokers, and the fair inference is, upon the whole record, that defendant *Becker* bought on the market at some time subsequent to the sale by the bank, and that Vermilye & Co. sold through brokers who did not in all cases disclose the name of the purchaser, and in this way the stock was permitted, as appears from the evidence to be customary, to remain in the name of parties other than the real owners. One witness testified:

"We never in any of our books, in stock transactions, have any other name entered as buyer except the name of the outside broker—the sales are made on the stock exchange. These sales in question were not listed stock, but curb stock, so called, but the same rule applies—curb brokers just the same."

Counsel for appellant makes a point on the fact that defendant brought from New York the brokers' bookkeeper and that he produced the only book he was instructed by defend-

ant *Becker* to bring. This was a credit cash-book showing the credit items in the cash account of Vermilye & Co., *i. e.* representing the credits that Vermilye & Co. gave to the Wisconsin Marine & Fire Insurance Company Bank, which were entered as if sales of stock had been made. The evidence shows that Vermilye & Co. kept a purchase and sales book which was not produced, respecting which the witness testified:

"That book will not show the date of the transaction, the name of the person, and the amount involved. It will show simply the date, the name of the person, number of shares, and price."

There is nothing in the evidence indicating any attempt to suppress evidence on the part of any of the defendants, and nothing to show but that the plaintiff might have obtained such book or any other evidence in possession or under control of the defendants or Vermilye & Co. We cannot think there is anything in the evidence to warrant the inference that, if this book referred to had been produced, it would have shown any transaction unfavorable to defendants. Doubtless it would have shown that in some cases sales were made through brokers and the names of the purchasers not disclosed.

It is also claimed by counsel for appellant that only non-dividend-paying stock passes current without transfer on the books to the purchasers, and finally returns to the firm from whom it was originally transferred. But there is evidence that stock paying dividends passed this way, and that the dividends are paid to the person in whose name the stock is at the time of payment, although not the real owner. The transactions usually and ordinarily accompanying a sale of this character seem to have been quite fully proved. Vermilye & Co. were authorized to sell. They reported sales in compliance with such authorization and credited the bank with the proceeds, and the bank likewise debited them. The stock was parted with and passed from the possession and con-

trol of the bank. From transactions proved both the bank and Vermilye & Co. understood there was a sale. The plaintiff was credited upon his indebtedness to the bank with the proceeds of such sales, and notified that the sales had been made, stating date, price, and credit given to him, all of which he assented to. This seems to constitute, at least in the absence of any evidence to overthrow it, quite formal proof of a sale, and is sufficient under the authorities. 1 Mechem, Sales, §§ 4, 218; *Skiff v. Stoddard,* 63 Conn. 198, 26 Atl. 874, 28 Atl. 104; 1 Cook, Corp. (4th ed.) §§ 331, 334. It is said by counsel for appellant that all these things may be sufficient to show that there might have been a sale, but they do not show a sale. We think they are sufficient to warrant the court in finding a sale upon the evidence in this case.

2. The appellant further contends that the evidence establishes an agreement between the pledgee bank and the three pledgors to keep the stock of each separate, and that this agreement applied to the stock of the Western Gas Company which belonged to plaintiff and was claimed to have been sold in May and June, 1895. The original note given by plaintiff, Weil, and Montgomery was a joint note and secured by the stock of the Milwaukee Gas Light Company. This note, however, was taken up and three notes given—one by Weil and one by *Smith* for $126,000 each, and one by Montgomery for $126,100. Each of these notes was indorsed by the other two makers, so that, while the indebtedness was separated, each continued liable for the whole debt, and the Milwaukee Gas Light Company stock was, with the approval of plaintiff, Weil, and Montgomery, sent to New York to be exchanged for Western Gas Company stock. The letter of advice by the three pledgors to the pledgee at this time directs how the stock shall be apportioned, according to which Weil was to receive stock to the par value of $126,142, *Smith* $120,766, Montgomery $120,892, Ferguson $50,000, Johnston $50,000, and Murphy $10,200. But, as has been seen, when the Western

Gas Company issued its certificate for the Milwaukee Gas Light Company stock, it issued it to Montgomery for 6,110 shares, and this was surrendered and three certificates issued to defendant *Becker,* one for 1,628 shares, one for 1,577 shares, and one for 1,575 shares, so that no one of these certificates ,covered only the shares of Montgomery, Weil, or *Smith.* It seems, therefore, that the pledgors themselves assented to this mingling of shares. The evidence shows they assented to the distribution of the shares as made in the three certificates, and thereby consented that the shares need not be kept separate. Waiving the question of the competency of the proof offered by plaintiff of the oral agreement and the question whether, if any such were made, it applied to the Western Gas Company stock, we think it is established that the plaintiff assented to the mingling of shares.

But we do not regard the question of the alleged mingling of shares important. Besides the 700 shares heretofore referred to, Vermilye & Co. sold 842 shares. These were included in the two certificates sent them for sale, one for 500 shares and the other for 2,477 shares. After the certificate for the 2,477 shares was split up into twenty-five certificates, 842 shares were sold between April 27 and June 24, 1895. It is not disputed but that these 842 shares were sold, but it is insisted that, they being sold out of a certificate containing shares of the bank, it must be determined that the bank sold its own shares and not the plaintiff's. Every share of the 842 was the same as every other share in the certificate, which included the shares of the bank. There were no earmarks on any particular shares by which they could be designated as the shares of the bank or the shares of the plaintiff.

"One share of stock does not differ from another share .of the same capital stock. Each is but an undivided interest in the corporate rights, privileges, and property." 2 Cook, Corp. (5th ed.) § 469; 26 Am. & Eng. Ency. of Law (2d ed.) 828; *Pietsch v. Krause,* 116 Wis. 344, 93 N. W. 9; *O. L. Packard M. Co. v. Laev,* 100 Wis. 644, 76 N. W. 596.

So the bank could sell any 842 shares out of the 2,477 as the shares of plaintiff. But it is said that, when the bank sold from this common mass without designation as to what shares were sold, the law conclusively presumed that it sold its own shares. The evidence, however, is that at this time the bank was not selling its own stock, but the stock of plaintiff. It did designate the shares sold as the shares of plaintiff. Williams testified:

"All the sales of the Western Gas Company stock or bonds made by the bank between the dates of April 27, 1895, to June 24, 1895, inclusive, were credited to the account of and on the notes of *A. E. Smith* with the exception of thirty-four hundredths of a share."

Mr. Williams was engaged in the bank and had knowledge of the facts and was custodian of the collaterals. Upon the proof before us it cannot be said that the bank did not at the time of sale identify the 842 shares sold as the plaintiff's stock.

Respecting the contention that the stock was sold upon a rising market we may say that between April 27 and June 24, 1895, the stock materially advanced, but after careful examination of the evidence on this point we are unable to say that there was proof of any material advance in the market price of any parcel of stock sold between the date of sale and the date of the entry of such sale by the bank. But, however this may be, we do not regard the question controlling. It was doubtless better for the pledgor to have the stock sold on a rising than on a declining market. And it appears from the evidence that the stock was at least fairly well sold, and probably for prices fully up to the market at the dates of sale. Plaintiff testified that he made no objection to the way the stock was sold and had none to make. He knew all the facts respecting the sales, and settled and received the proceeds shortly after the sales had been made. When we consider that the indebtedness to which the stock was collateral was long past due at the time of sale, and that under the power of

sale the bank had the right to sell at private sale without notice, that at least a fair market price satisfactory to plaintiff was obtained and accounted for to plaintiff, we are not impressed with the weight of this branch of appellant's argument. The case appears to have been fairly tried below, and findings made in favor of the defendants upon all the material issuable facts presented in the case. We cannot say the finding that there was a sale is not supported by the evidence. There being a valid sale under the power, no other question need be considered.

*By the Court.*—The judgment of the court below is affirmed.