## In re H. B. HOLLINS & CO.

## Ex parte H. B. HOLLINS & CO.

### (District Court, S. D. New York.   May 4, 1915.)

1. PLEDGES ⬤⟿47—RETURN OF PROPERTY UPON PAYMENT OF DEBT.
   A pledgor of bonds to secure a loan had a right to reclaim all of the bonds upon payment of the total loan, but had no right to reclaim any part of them by paying a proportion of the loan.
   [Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 111, 112;  Dec. Dig. ⬤⟿47.]

2. PLEDGES ⬤⟿46—RETURN OF PROPERTY UPON PAYMENT OF DEBT.
   A pledgee of 1,200 bonds to secure a debt of $1,000,000 repledged 127 of them to secure its debts to different parties, and the remaining 1,073 to a bank to secure a loan of $950,000.  The pledgee became bankrupt, and the pledgor bought the loan of the bank and sold enough of the bonds, with other collateral security held by the bank, to pay the loan, leaving in its hands 138 of the bonds and a certain amount in cash.  *Held* that, where the 127 bonds exceeded in value the balance of the debt, the pledgor had paid all needed to redeem the bonds repledged to the bank, as the pledgee had put it out of its power to return the 127 bonds.
   [Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 109, 110;  Dec. Dig. ⬤⟿46.]

3. PLEDGES ⬤⟿42—REPLEDGING PLEDGED SECURITIES—REDEMPTION.
   Where a pledgee of bonds pledged them with securities of its own to secure an indebtedness to a bank exceeding the pledgor's indebtedness to it, its own securities were in the first instance liable for the excess of the indebtedness above the pledgor's indebtedness, and the pledgor was entitled to marshal the pledgee's securities first upon the indebtedness, though it had agreed that the bonds might be repledged, not only for the amount of its indebtedness to the pledgee, but for as much more as the pledgee could get, as the purpose of this agreement was not to enable the pledgee to raise capital for its business on the equity of the pledgor.
   [Ed. Note.—For other cases, see Pledges, Cent. Dig. § 101;  Dec. Dig. ⬤⟿42.]

In the matter of H. B. Hollins & Co., bankrupts.  On motion by the alleged bankrupts for the payment of money to them.  Petition dismissed.

See, also, 212 Fed. 317;  225 Fed. 618;  230 Fed. 920.

This is a motion by the alleged bankrupts to compel Crossman & Sielcken to pay over some $4,800, the balance of a fund which they hold in their hands under the circumstances hereinafter detailed.  The alleged bankrupts have passed through a composition and are seeking to reduce to possession some of the assets of the estate.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before bankruptcy the alleged bankrupts lent to Crossman & Sielcken $1,000,-000 upon the pledge of 1,200 New York City 4½ per cent. bonds, on which they had a right under the contract themselves to borrow, not only up to the amount of their own advances, but as much as they could get besides. A part of these bonds they delivered to the First National Bank and Equitable Trust Company upon two loans, pledging the bonds delivered in each case for more than $833.33 a bond, that being the proportion of $1,000,000 which each of the 1,200 bonds would bear if it was distributed proportionately. By far the greater part of the bonds, 1,073 in all, however, they pledged to the Chase National Bank upon a loan of $950,000, giving as collateral along with them $80,000 of St. Louis & San Francisco bonds of their own and $5,000 Northern Pacific stock belonging to one Ulrich, who was heavily in their debt.

After the bankruptcy Crossman & Sielcken bought the whole loan of the Chase National Bank, with the permission of this court, and had sold the St. Louis & San Francisco bonds, the Northern Pacific bonds, and enough of the 1,073 New York City bonds to pay the loan. There remain in their hands 138 New York City bonds and $13,900.90 in cash. The alleged bankrupts now seek to reclaim that portion of this surplus which the value of St. Louis & San Francisco bonds and Northern Pacific stock bore to the total collateral pledged to the Chase National Bank.

Crossman & Sielcken contest the jurisdiction of this court and contest the merits as well. The supposed source of jurisdiction rests upon the facts as stated and also upon the seventh article of the petition upon which Crossman & Sielcken got leave of this court to buy the loan. That article is as follows: "That as above set forth almost the entire equity in the collateral held as aforesaid by the Chase National Bank belongs to your petitioners. The interest of the owners of the other collateral as aforesaid can amount to only a few hundred dollars, which your petitioners will pay over from the proceeds of sale to such owners or to the receiver herein as may be directed by the court or by said receiver."

William C. Armstrong, of New York City, for alleged bankrupts.
Leonard B. Smith, of New York City, for Crossman & Sielcken.

LEARNED HAND, District Judge (after stating the facts as above). [1, 2] Crossman & Sielcken had the right to reclaim all the bonds upon payment of the total loan, but they had no right to reclaim any part of them by paying a proportion of the loan. Had not the alleged bankrupts put it out of their power to deliver the 127 bonds pledged to the First National Bank and to the Equitable Trust Company, Crossman & Sielcken must have paid, not only the Chase National Bank loan, which they have done, but $68,322.81 in addition, which is the balance of what the alleged bankrupts lent them. When they had done that, they might keep all the surplus and demand the 127 bonds, pledged on the First National Bank and Equitable Trust Company loans. In fact, however, the alleged bankrupts did put it out of their power to comply with their contract; they cannot deliver the 127 bonds upon payment of $68,322.81. Certainly this excuses Crossman & Sielcken from performance according to their contract; they have a set-off equal to the value of the bonds so pledged which cannot be delivered, and this set-off is much greater than the unpaid balance, $68,322.81. Therefore they have paid all that they need to redeem the bonds upon the Chase National Bank loan.

[3] The trouble, however, is that Crossman & Sielcken did not use their own money altogether in paying the Chase National Bank; on the contrary, they used the securities of the alleged bankrupts, and it is upon this account that the alleged bankrupts insist that the surplus

should be shared ratably with the money used. If Crossman & Sielcken are entitled to marshal the securities of the alleged bankrupts first upon the loan, this is not correct; otherwise, it is. Skiff v. Stoddard, 63 Conn. 198, 26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102, stands squarely with them, but it is a mistake to suppose that in this feature of the case it gets any authority from Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981, which cites it only upon the general question of whether a broker's customer is an owner of stock or an obligee of a contract. The crucial point in the case rests in the fact that Crossman & Sielcken gave the alleged bankrupts express leave to repledge for any sums they might choose, thereby taking the case out of the class where the pledge to the bank was either wholly unlawful or for a sum larger than the broker had the right to repledge. In each of these cases the alleged bankrupts admit that the customer may marshal the bankrupt's property first upon the loan. In re Leavitt & Grant, 215 Fed. 901, 132 C. C. A. 139.

Where the pledge is a conversion, there is no doubt an obvious equity favoring the customer against the general creditors; the latter agreed to take the risk of the bankrupt's solvency, while the customer risked only his good faith. It must be conceded that, where the agreement is as in the case at bar, this ground vanishes, though it should also be remembered that the implied agreement generally is in fact what was expressed here, for the parties understand that the broker will repledge for any amount he can get of the banks. However that may be, the question here is upon an express agreement. In Skiff v. Stoddard, supra, the reasoning was that insolvency had changed the equities of the situation, and that, while the customer could have demanded of the broker his application of his own securities first, it was not so as against his general creditors, whose money might well have purchased those securities. It is hard to see how the question could arise while the broker remained solvent; but, if so, it is also hard to see how insolvency should give the general creditors greater rights against the customer than the broker had. A solution must be found, I think, with all respect, in the situation as it was created when the loan was made. At that time the broker selected from his general estate these securities to be applied upon the loan, and the question really is whether he intended them to be used in priority to the customer's securities pledged along with them. It would, however, be a fiction, I think, to treat the case as though there were generally any actual intent about it. True, a broker might show that he added of his own securities all that were necessary for the loan, over and above what he had advanced upon his customer's securities. In such case his intent would be clear to have his own securities go for any such balance.

Generally we have only the case where the whole block of securities is pledged together, and the question is not of any intent, but of what would have been thought fair at the outset, or, as we say, of the implied intent. The customer's agreement that the broker may repledge for any sum is not intended, I believe, for the purpose of allowing the broker to raise capital for his business out of the equity of his cus-

tomers in their securities. He pays them no interest upon them, and no honest broker would attempt to use such a contract for such purposes. The purpose is to enable the broker to place the securities in a general loan, to get money upon which to carry the securities, and not to compel the banks to figure upon each security a given amount, which they would not do. If the parties were faced at the outset with the proposal that the broker's own securities were not to be used to carry so much of the loan as exceeded his advances to the customer, I cannot believe that they would so understand their contract, unless, of course, the customer's margin was less than the margin required by the bank for the same loan. To that extent a genuine extinction may exist.

If this be true, it follows that, when a broker pledges his own funds along with a customer's under such a contract, the situation is no different from a pledge without it, except in this: That the pledge is not a conversion and the broker has not misused his powers. In the case at bar there is no reason to suppose that the alleged bankrupts' securities were pledged with the bank in order to get an advance equal to what the alleged bankrupts were willing to give on the bonds alone. The loan, so far as appears, was in the general course of business, and so much as the alleged bankrupts borrowed on the bonds over what they had lent, they borrowed for their own purposes. In such a case they should be held to have pledged their own securities in the first instance wholly for the excess.

It is therefore unnecessary to consider the point of jurisdiction. The petition is dismissed.